# In re LOWER BROADWAY PROPERTIES, Inc.

District Court, S. D. New York.

Jan. 12, 1945.

Rathbone, Perry, Kelley & Drye, of New York City (Henry E. Kelley and Frank H. Heiss, both of New York City, of counsel), for trustee.

Scribner & Miller and Marshall, Bratter & Seligson, all of New York City (Louis G. Bernstein and Harold P. Seligson, all of New York City, of counsel), for First Mortgage Bondholders Committee.

Davis, Polk, Wardwell, Sunderland & Kiendl, of New York City (James A. Sweet, of New York City, of counsel), for Guaranty Trust Co.

Edmond B. Bellinger, of New York City, for Laura J. Conway.

Alfred S. Perlstein, of Brooklyn, pro se.

Schiff, Dorfman, Stein & Brof and David M. Palley, all of New York City and Holden Brothers, of White Plains (David M. Palley, Leon Brof, and Jonathan Holden, all of New York City, of counsel), for bondholders.

Tanner, Sillcocks & Friend, of New York City (John T. Carr Lowe, of New York City, of counsel), for Frederick C. Tanner and J. Ogden Turner, holders of Preferred and Common Stock of Lower Broadway Properties, Inc.

George Zolotar, of New York City, (Arthur Richenthal, of New York City, of counsel), for Securities and Exchange Commission.

White & Case, of New York City (Sherwood Hall, of New York City, of counsel), for New York Trust Co.

RIFKIND, District Judge.

These proceedings for reorganization under Chapter X of the Chandler Act, 11 U.S.C.A. § 501 et seq., were instituted by voluntary petition on November 24, 1942. The present application is made by the trustee for the approval of a plan of reorganization proposed by him and approved by the Bondholders' Committee (the word "bonds" will be used to identify the mortgage certificates and the word "bondholders" for the holders of the mortgage certificates).

The debtor's chief asset, and the only one which need concern us, consists of the land at Nos. 44–50 Broadway, Borough of Manhattan, City of New York, and the office building thereon erected, known as the 50 Broadway Building. The ground area of the land is 13,643 square feet. The cubic content of the building is 3,852,400 feet, divided into thirty six stories and two penthouses. The rentable space consists of 254,467 square feet.

The building was opened on May 1, 1927 and until the institution of these proceedings was operated by the debtor. Both its gross rental income and its net income (before mortgage interest, depreciation, income taxes, amortization of bond discount and expense) have fluctuated widely. For each of the two years ending February, 1931, and February, 1932, its gross rental income exceeded $1,000,000. In each of four years its net income exceeded $500,-000, reaching a peak of $677,000 in 1931. During the nine year period 1936 to 1944, the debtor's largest gross rental income was in 1937, when it amounted to $523,221.76

and the smallest was in 1943, when it fell to $330,645.77. The peak and trough of net income also occurred in the same years, respectively, and amounted to $204,736.63 in 1937 and $31,177.93 in 1943. Today the building is occupied to 99.5% of its capacity, the United States Army being in possession of about one-half the rented space under a lease subject to cancellation upon thirty days' notice. The estimated net rental income for the year ending April 30, 1945 is $178,593. Average net rental income throughout the entire history of the building averages approximately $209,000 a year.

The debtor's capitalization consists of:

| | |
|---|---|
| first mortgage certificates, principal amount, | $3,692,000; |
| debentures, principal amount, | 44,000; |
| $7. cumulative preferred stock, | shares — 9,570 |
| common stock | shares — 3,000. |

In addition, there is accrued and deferred interest on the first mortgage certificates which on November 24, 1942, amounted to $1,138,880.84. Miscellaneous claims do not exceed $15,090.95.

The cost of the land to the debtor was $2,550,000 and the cost of the building was $3,239,630, making a total of $5,789,630. The life of the building is about thirty years and with good maintenance and occasional remodelling, possibly fifty years. The land and building are assessed by the City of New York for real estate tax purposes at $4,000,000. Mr. Russell Cruikshank, the appraiser who testified on behalf of the trustee, valued the building, as of September 25, 1944, at $2,400,000, of which he assigned $900,000 to the land. He estimated the net rental income from the building for the next two or three years at $145,740. The expert who testified on behalf of the Bondholders' Committee, Mr. Vought, valued the land and building at $3,000,000 and estimated its net rental income at $199,000 per annum. I accept Mr. Cruikshank's appraisal both as to value and income.

The unmortgaged assets are estimated at $89,872.82.

The plan proposes that the principal of the present first mortgage be cut in half, from $3,692,000 to $1,846,000; that sinking fund and interest obligations be payable only if and to the extent that income is available therefor; that the first 25% of the available net income (as defined in

the plan) be applied to sinking fund purposes and that interest up to 6% be paid out of the remainder; that the balance of available net income be applied, first, to the payment of interest so as to bring the interest rate up to 6% per annum from the date of the consummation of the plan to the interest date and, secondly, to any proper corporate purpose; that the presently outstanding preferred and common stock be cancelled; that holders of mortgage certificates receive for each $1,000 principal amount an income certificate of $500 principal amount and voting trust certificates for ten shares of new common stock; that debenture holders receive for each $1,000 principal amount voting trust certificates for two shares of new common stock (requiring a total of 88 shares out of a total of 37,008 shares) and that holders of miscellaneous allowed claims be paid their distributive shares in cash; that a voting trust is to be established, the voting trustees to be named by the court and the trust to endure for five years, and be renewable for an additional five years upon the approval of 51% of the voting trust certificates and terminable at any time by the vote of the holders of two thirds of the voting trust certificates; that management is to be confided in a board of directors initially selected by the court after receiving recommendations from the interested parties.

There is no question that the debtor is insolvent and that nothing is available for the holders of preferred and common stock. That proposition has not been challenged by anyone and none of the objections made to the plan is addressed to the provision thereof which allocates nothing to the holders of such preferred and common stock.

The Securities and Exchange Commission has not filed a written report. However, upon the hearing the Commission expressed, by its counsel, the recommendation that the plan be disapproved. The objections asserted by the Commission form a convenient arrangement for the discussion of all the objections and they will be treated in order.

1. The Commission declares that the amount of the debt, namely, $1,846,000, proposed under the plan, is excessive and that it ought not to exceed $900,000, carrying an interest rate of 5%, cumulative, payable out of income. This objection is founded upon the view which the Commission takes of the prospective earnings of the building and of its value. Its estimate of the value has not been given to the court. Its estimate of earnings is $90,000 per annum, based roughly upon the three year average immediately preceding reorganization. This estimate of earnings was given to the court by the Commission's counsel and no opportunity has been afforded to the parties to cross-examine and determine the accuracy of the basis upon which the forecast is based. History may prove the Commission right. If so, it is not because its employees have any greater acquaintance with the unpredicable future than others trained in the business of valuing real estate. If we regard the past as the mirror of the future, all we can say is that the range of possibilities for this building is such as to lend support to the most optimistic as well as to the most pessimistic of prophets. The building has enjoyed a rental income as high as $1,037,913 a year, and as low as $330,645; a net income as high as $677,853 and as low as $31,177. Currently, its gross rental income is $464,880 and its net rental income $178,593. Unquestionably the current rise is attributable to the war; but whether cessation of war will bring a decline or an increase is a question which defies the ability of the forecasters. The appraiser employed by the trustee, a man of acknowledged eminence in his calling, estimated prospective earnings of $145,740; but aware of the limitations of his art, he refused to express any opinion beyond three years.

These doubts could, to a very large extent, be entirely avoided by a plan of reorganization which limited the capitalization of the new corporation entirely to common stock. This would eliminate the problems of maturity, interest rate, sinking fund and size of the mortgage. Such a plan would be feasible and it would be fair except in one respect. Whereas the debtor corporation under its present capitalization was privileged, for purposes of calculating income tax, to deduct from its income the amount of the interest on the outstanding bonds ($221,520), the new corporation, capitalized entirely by common stock, would be able to make no such deduction. Present rates of taxation do not permit the treatment of the resulting tax liability as a minor matter. Of course, in considering a plan, the statute does not permit us to depart from the requirements of fairness and feasibility merely to mini-

mize taxes; nor should we, however, so mold a plan for creditors who have already lost very heavily as in the instant case as to subject the enterprise after bankruptcy to greater taxation than when it was prosperous.

The amount of debt suggested by the Commission at the rate of interest suggested, namely, 5%, would allow a deduction from taxable income for the new corporation of $45,000 (plus the depreciation allowed on the building of about $65,000, a total of $110,000) compared to about $286,-000 for the debtor corporation. Manifestly, if, as the Commission estimates, the new corporation will earn only $90,000, then it would pay no income taxes; but currently the income exceeds $178,000; and no one can tell that it may not be considerably more during all or part of the thirty years before the new income certificates mature.

In the light of Mr. Cruikshank's and Mr. Vought's appraisals, I think the trustee has chosen a fair and conservative solution. The amount of the funded debt is well within the appraisal of an impartial expert. There is no certainty about the payment of 6% annual interest and none is promised by the plan. On the other hand the annual operation of the sinking fund will reduce the principal of the debt and increase the likelihood of reaching the 6% rate. The plan provides what, under the circumstances, must be regarded as adequate protection against the imposition of income tax until income reaches a considerably higher level than presently enjoyed.

■ 2. The Commission comments adversely on the provision of the plan which prescribes that one-fourth of the available net income should be paid into the sinking fund regardless of how low a rate of interest that permits to be paid. It suggests that the first claim against available net income should be held by interest—say at the rate of 5% per annum—and that one-half of the remainder should be applied to sinking fund. It can easily be demonstrated that the trustee's plan tends (in all probability) to favor those bondholders who retain their bonds until maturity or redemption. A low interest rate tends to depress the market price of the income certificates and permits a larger acquisition by the sinking fund, thus improving the position of those who continue to hold the certificates. At least two considerations tend to moderate the force of the Commission's argument. As the sinking fund operates more rapidly, under the trustee's proposal, it reduces the principal of the debt more quickly and available income is thus sooner translated into a higher interest rate. Also, the more continuous operation of the sinking fund provides a more continuous demand for the income certificates and tends to sustain or advance the market price of the securities. On which side of the line the narrow margin of advantage will lie at any given time depends upon the unpredictable circumstances which attend the occasion. Nor need I decide the question and impose upon the creditors my guess as to where the net balance of advantage lies. The statute does not require of the court to find the fairest plan conceivable but only that the plan proposed be fair. The trustee has, in compliance with statutory command, solicited the suggestions of all parties and has conferred with the Committee and other persons who have appeared in the proceedings. To some extent, undoubtedly, the plan represents an accommodation to the views of such interested persons. It is not wrong of the trustee so to choose his alternative courses in the various branches of the plan that his final product will win approval of those entitled to vote on the plan. Such accommodation may not go beyond the bounds of fairness and feasibility nor may it enter the area of inequitable discrimination. Here the trustee's choice does not offend in any of these respects.

■ 3. The Commission objects to the treatment accorded by the plan to the debenture holders and suggests that instead of two shares of stock they receive $35 in cash for each $1,000 principal amount of debentures. This would require a total of $1,540. I agree. The estimated available unmortgaged assets makes such a proposal the only one fair and suitable under the circumstances.

4. The Commission objects to the provisions of the plan which establish a voting trust and direct the distribution to the bondholders of voting trust certificates in lieu of stock in the new corporation. In this objection it is joined by a number of individual bondholders. The Bondholders' Committee supports the trustee's position. The Commission's opposition is based, as I understand it, not so much on the lack of fitness of a voting trust to the peculiar cir-

cumstances of this particular case but rather on a general objection to voting trusts in all cases. It suggests that a voting trust violates section 216 of the Chandler Act. Section 216, subdivision (12), prescribes that a plan of reorganization shall provide for the inclusion in the charter of the corporation emerging from reorganization, of provisions prohibiting the issuance of non-voting stock. Holders of voting trust certificates will, of course, not be able to vote for the election of directors so long as the trust endures.

■ Considering the expert draftsmanship that entered into the making of the Chandler Act and the wide knowledge of the voting trust as a common corporate practice, I am of the opinion that had the Congress intended to outlaw voting trusts in reorganization plans it would have so stated explicitly and would not have left it to implication. No case has been called to my attention, and I have found none, which holds that a voting trust would transgress section 216. I hold that it does not.

We descend, therefore, from a consideration of legislative mandate to a particular plan. The question is whether the voting trust provisions render the plan unfair or impair its feasibility. The answer to that question, I believe, depends upon the circumstances of each case and the purpose which the voting trust is intended to and will subserve. Like any other instrument in the arsenal of corporate management it may be intended as a tool or a weapon. In this instance I think a voting trust for a reasonably short period will serve a very desirable purpose. As a result of the plan, the present management representative of the common stock is entirely eliminated. A large and valuable property is being turned over to an unorganized group of bondholders. There has not yet been developed any institutionalized responsibility for the enterprise which is a necessary characteristic of the successful business corporation. For the past two years this fatherless corporation has been under the guardianship of the court; as a rule an inadequate substitute for management by the owners of the business, although in this instance the court had the aid of a trustee who is one of the most experienced real estate men in the City of New York. True, the plan requires the court to name the first board of directors after receiving the suggestions of interested parties. But a year runs by with bewildering speed; it is all too brief a period for the formulation of policy and plans with respect to the slow-paced business in which the debtor is engaged. It seems to me, therefore, that it would well serve the interests of the great body of bondholders if they could be assured of a longer period of continuity of management before the selection of a board of directors was thrown open to an election, which is generally unaccompanied by debate, of candidates most of whom are in all probability utterly unknown to the voters.

■ For the purpose which the voting trust is to serve in this instance, I think, five years ought to suffice. After the lapse of such a period I do not think it is fair to permit the majority to disfranchise the minority. I, therefore, approve the suggestion offered by Joseph Dauber et al., to the extent of eliminating the provision for the renewal of the voting trust after a lapse of five years but not to the extent of striking the voting trust out altogether.

■ 5. The Commission objects to that provision of the plan which authorizes the reorganized corporation to place a mortgage upon the property which shall be senior to the mortgage securing the new income certificates. I agree. While it is desirable so to arrange the plan as to avoid the possibility of further reorganization, if the corporation is so embarrassed that it cannot function without borrowing on a senior mortgage it might be best to bring it back into court; if the object of the prior mortgage is to effect a substantial distribution to bondholders, it seems better to let a purchaser do the borrowing and purchase the building for cash to be distributed to bondholders.

■ 6. There are objections on the part of the Commission as well as on the part of some bondholders to the size of the reserves which the plan authorizes the board of directors to establish. Largely a business judgment is involved based upon an appraisal of the unpredictable future. I am of the opinion that the trustee's proposals, concurred in by the Committee, are well within the bounds of reasonableness and are fair and feasible.

■ 7. The Commission objects to that provision of the plan which authorizes the new corporation rather than the indenture trustee to acquire income-certificates by the application of funds available for cor-

porate purposes (as distinguished from funds in the sinking fund). I agree. All acquisitions of income certificates should be handled by the indenture trustee and the trust indenture should so provide.

I find the plan, when modified in conformity with this opinion, fair and equitable, and feasible, and in compliance with section 216 of the Bankruptcy Act.