## In re QUAKER CITY COLD STORAGE. CO.
### No. 21935.

District Court, E. D. Pennsylvania.
March 28, 1947.

Gilbert W. Oswald and Bernard G. Segal (of Schnader, Kenworthey, Segal & Lewis), and Wexler & Weisman, all of Philadelphia, Pa., for Trustee of Debtor Corporation.

J. Wesley McWilliams (of McWilliams, Wagoner & Troutman), of Philadelphia, Pa., for Debtor Corporation.

Edwin W. Semans (of Mancill, Cooney, Ott and Semans), of Philadelphia, Pa., and James J. Cannon, of New York City, for Bondholders' Protective Committee (Burns Committee).

Lockwood W. Fogg, Jr., of Philadelphia, Pa., for Philadelphia Perishable Products Terminal Co. and Baltimore & O. R. Co.

Joseph Sharfsin, of Philadelphia, Pa., and Leonard Schreiber, of New York City, for Carter-Gregory Bondholders' Committee.

Bernard J. Kelley, of Philadelphia, Pa., for Clifford T. Kelsh and Ethel D. Kulp.

Milton M. Bennett, of Philadelphia, Pa., for petitioning bondholders.

Frederick T. Finnigan, of New York City, for Securities and Exchange Commission.

KALODNER, Circuit Judge.

The Trustee's plan of reorganization was referred to the Special Master herein, to conduct the plan hearing and report thereon to the court. At the plan hearing an extensive record was made by testimony and exhibits. No other plan of reorganization was proposed, but the Trustee and other parties in interest submitted certain proposed amendments.

The Master filed an exhaustive and detailed report, carefully reviewing the entire content of the record and thoroughly covering the Debtor's history, past and current earnings, the evidence as to valuation of the Debtor, the structure, fairness and feasibility of the plan, and all objections made and amendments offered. The comprehensive and accurate statement provided by the

Master's report on these subjects makes it unnecessary to review them in elaborate detail in this opinion.

Briefly, the Debtor owns and operates a group of cold storage warehouses in Philadelphia, of which the largest is a modern and up-to-date structure, built in 1926, and the others are old buildings. The construction of the new plant in 1926 involved great enlargement of the corporation's debt, to $3,500,000, with annual fixed charges of $200,000. The Debtor failed by a wide margin to earn its fixed charges in the ensuing years, and in 1935 was reorganized under Section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. That reorganization left the Debtor with (1) a first mortgage bond issue in the total principal amount of $1,028,500, bearing interest at five per cent; (2) preferred stock, now outstanding in the amount of approximately 25,000, shares with a liquidation preference of $50 per share and entitled to cumulative preferred dividends in the amount of $2 per share per year; and (3) an issue of common stock holding the exclusive voting power in the corporation, all of which common stock was issued to and is held by Philadelphia Perishable Products Terminal Company.

Following its reorganization in 1935, the Debtor again failed in every year to earn its fixed charges until 1942, when this proceeding was initiated after default in the payment of interest. During this proceeding, the Debtor has earned on the average of $58,000 per year after present bond interest, depreciation and income taxes. However, although these earnings are undoubtedly due in substantial part to a vast improvement in the management of the business, it is conceded that they also reflect abnormal war-time conditions.

Basically, the plan proposes to cancel the present bond issue and substitute a new bond issue in 60 per cent of its amount, or $617,500, maturing in 25 years. The new bonds are to bear fixed interest at the rate of four per cent per annum, and the Debtor is to pay $15,000 per year if earned, into a sinking fund, which will be a cumulative charge on earnings and, if maintained, will reduce the new bond issue to less than $250,000 by the time of its maturity. The present stock issues are to be cancelled and replaced by a single new issue of common stock.

The present first mortgage bondholders will receive, for each present $1,000 bond, $100 in cash, a new first mortgage bond for $600, and 100 shares of new common stock. The preferred stockholders will receive one share of new common stock for each share of the present preferred. The effect of this distribution is to give to the present first mortgage bondholders (in addition to the cash and new bonds mentioned) 80 per cent of the new common stock, and to give the present preferred stockholders 20 per cent. No provision is made for the present common stock, since there is clearly no equity for that stock.

The plan provides that the new stock shall be issued subject to a voting trust, discussed below.

The Master found that the Trustee's plan, as amended by him, complies with the requirements of Section 216 of the Bankruptcy Act as amended, Title 11 U.S.C.A. § 616; is fair, equitable and feasible, and recommended that it be approved. He did not recommend approval of any other amendments.

In considering the report and the exceptions filed, one is impressed at the outset with the support all basic features of the Trustee's plan have received from the security-holders. The dominant securities in this case are of course the first mortgage bonds, and representatives of an unusually large proportion of these bonds have actively participated in this proceeding. The Burns Committee represents the holders of approximately $473,000 of the first mortgage bonds, or nearly 46 per cent of the entire issue. The Philadelphia Perishable Products Terminal Company and affiliated interests, which have been directly represented by counsel, hold $237,750 of the bonds as well as 5,730 shares of preferred stock. The Carter-Gregory Committee filed appearances in behalf of approximately $175,000 of the first mortgage bonds. Clifford T. Kelsh and Ethel D. Kulp, also directly represented by counsel, hold $38,000 of bonds and 2,200 shares of preferred stock, and the petitioning bondholders, who instituted this proceeding, hold $11,000 of the bonds. The representations mentioned

aggregate $935,000 of the $1,028,500 first mortgage bond issue—approximately 90 per cent. Allowing for some duplication resulting from changes in ownership it is reasonable to assume that at least 75 per cent of the present first mortgage bondholders have been represented in the reorganization proceedings.

The representatives of this very large proportion of the bondholders have approved the plan in all basic respects, and their exceptions are limited to matters of detail relating to the voting trust, hereafter considered. Certain exceptions, limited in scope, have been filed by the Securities and Exchange Commission relating to the financial structure of the plan and the division of the new common stock, and in some of these exceptions the Commission is joined by the Carter-Gregory bondholders committee. The Commission also objects to the voting trust.

■■ Of course, neither the absence of objection to a plan, nor overwhelming support of a plan from security-holders, obviates the duty of the court to consider independently whether the plan meets the requirements of the Act. On the other hand, if the court finds that a plan so supported meets the Act's requirements, it is not its function to seek a "better" plan, or to substitute its personal preferences on optional matters of policy for the declared wish of the great body of the parties in interest. In re Philadelphia & W. Ry. Co., D.C., 51 F.Supp. 129, 130; In re Lower Broadway Properties, D.C., 58 F.Supp. 615, 618.

■ The Master found, and all parties agree, that the plan is feasible. The Debtor has at all times been able to earn a profit on its operations. Its repeated difficulties have resulted from a continuing combination of excessive fixed charges and poor management. A history of two reorganizations within seven years demands a reduction of fixed charges to a level unquestionably safe, and the plan reduces the fixed interest charges to less than $25,000 per year. The principal amount of the mortgage approved in 1935 is reduced by 40 per cent. To meet its fixed interest requirements and maintain the sinking fund,

the new company will have to earn on the average $40,000 per year after depreciation and taxes. The current profit from operations (before depreciation, interest and income taxes) is running over $200,000 per year. This is concededly abnormal. But over the pre-war years 1926–1941, under poor management and before the advent of the increased volumes resulting from the quick-frozen food business, the comparable average figure was $96,000. Conservative estimates of the future average annual operating profit, offered at the plan hearing, ranged from $90,000 to $110,000. A liberal allowance for depreciation is $30,000 a year. It accordingly appears that the new company should be able to meet its fixed charges and maintain the sinking fund.

Evidence of the working capital margins of other cold storage companies, submitted by the Securities and Exchange Commission, indicates that the new company will have an ample working capital. There are strong indications that future competitive conditions will require considerable investment in plant improvements, and the plan wisely leaves management a broad leeway to meet such needs. Assurance of a continuance of good management is essential, and this is provided through the voting trust.

On the basis both of the record and my own study of the Debtor's operations, on which I have kept closely informed during this reorganization proceeding, I conclude that the plan is feasible.

■ While conceding the feasibility of the plan as it stands, the Securities and Exchange Commission has suggested that the plan would be improved by increasing the annual sinking fund payment to $25,000 or 50 per cent of the earnings, whichever is higher, until the new first mortgage is reduced to $400,000. No security-holders press for this change, and there are reasonable arguments against it. The proposal is based on the current high rate of earnings, and there is no assurance that such earnings will continue until the mortgage is reduced to $400,000. Enlargement of the sinking fund may prevent needed plant improvements, which if made would, of course, enhance the security supporting the mortgage.

However, the amendment is suggested merely as an improvement, not as an essential provision. It is not argued that a sinking fund which will reduce the mortgage to less than $250,000 at maturity is dangerously low. The matter is one of optional policy, and I agree with the Master that it is not the court's function to impose its personal preferences in such a case.

The same observations apply to the Commission's further suggestion that expenditures for plant improvements which may be deducted in computing earnings available for sinking fund payments, should be limited to $25,000 per year. The plan adopts the policy that the new company should not be prevented from making a needed improvement (which may cost more than $25,000) simply for the sake of meeting sinking fund requirements. The fact that the sinking fund payment is not eliminated, but continues as an additional charge on the next year's earnings, seems an adequate safeguard against abuse. The sinking fund must still be maintained, and the improvement will also increase the value of the mortgage security. It is not the court's function to reverse a debatable policy decision of this kind.

The Commission and the Carter-Gregory Committee contend that the plan is unfair to the present bondholders in apportioning the new common stock 80 per cent to the bondholders and 20 per cent to the present preferred stockholders; they argue that the ratio should be 85 to 15. The contention is premised on objection to the Master's finding that the value of the Debtor's estate for reorganization purposes is $1,350,000. The Commission and the Carter-Gregory Committee urge a valuation of $1,230,000.

The record made at the plan hearing contains ample evidence to support the Master's finding. A basic criterion of value is the estimated future earning capacity of the business. No such estimate is expected to imply certainty. It "must be based on an informed judgment which embraces all facts relevant to future earning capacity and hence to present worth, including, of course, the nature and condition of the properties, the past earnings record, and all circumstances which indicate whether or not that record is a reliable criterion of future performance", Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 526, 61 S.Ct. 675, 685, 85 L.Ed. 982. The evidence met these requirements fully. Estimates of future earnings were given by three well-qualified experts, based on discriminating analysis of past operating results and elaborate consideration of all factors making for a difference in the future. No one has suggested that any significant factor was omitted from consideration. In discounting to the point of ignoring the "war" earnings of the past five years, as well as in other respects, the estimates were made, as they should be, on a conservative basis.

The expert witnesses were in substantial agreement. The range of their estimates of average future operating profit (before depreciation, interest and income taxes) ran from $106,000 per year in one case to $110,000 in the others, and their eventual valuations ran from $1,380,000 in the former case to $1,350,000 in the latter. All agreed that their figures were necessarily approximations and were within the range of a reasonable difference of opinion.

The Securities and Exchange Commission estimated the future average operating profit at $90,000. This is the main basis of the difference in the Commission's valuation. There is no major dispute over the capitalization rate (the Trustee's witnesses used 8 and 9 per cent, the Commission 8.5) or in the estimate of excess cash (the witnesses were $40,000 more conservative than the Commission). The Commission took as its base for estimating earnings the results in the single year 1941, and increased volume by about 12 per cent. The Commission concedes that the effect of a great improvement in management was not yet felt in 1941, so that the 12 per cent increase has to cover this major difference as well as the improved prospect for volume of business offered by the rapid growth in quick-frozen foods.

I have carefully considered all factors cited by the witnesses and the Commission, in the light of the current operating profit (over $200,000) and the 1926–1941 average

($96,000). I have given weight to the fact that the latter figure was produced in a generally depdessed period under poor management. and before the advent of the frozen food business. I have also applied my own knowledge of the Debtor's operations gained from personal observation during this proceeding. From this study, I agree with the Master that the Commission's estimate seems unduly low. I think the estimates of the Trustee's witnesses are not unduly high, and that a total valuation of $1,350,000 is not excessive, and I find the value of the Debtor's estate in that amount.

■ Reverting to the fairness of the 80-20 apportionment of the common stock, the equity of the preferred stockholders, at a valuation of $1,350,000, is approximately $260,000 (determined as of the close of last year). The residual claim of the bondholders, similarly determined, is about $420,000. The ratio between these two amounts is approximately 60-40 in favor of the bondholders. By dividing the new common stock in the ratio of 80–20, the plan reduces the present equity of the preferred stockholders in half, and gives 80 per cent of the equity of the new company (and all increases therein) to the bondholders, in return for their partial relinquishment of priority.[1] I agree with the Master that such a premium, given in common stock, is not adequately measured by its immediate cash value, which is substantial. It meets fully the tests specified by the Supreme Court in Consolidated Rock Products Co. v. DuBois, supra. I find that it constitutes full, ample and generous compensation to the bondholders for the rights relinquished by them.

While the court is required to reach its conclusion on this subject independently, and I have done so, it is appropriate to note that the representatives of 75 per cent of the bondholders, including the Burns Committee, after careful consideration of the plan, have agreed that it is amply fair to bondholders, and the Com-

mission's statement would also clearly lead to this conclusion on the basis of the value I have found.

The foregoing also serves to dispose of the suggestion of the Commission and the Carter-Gregory Committee that the present bondholders should be given an option to convert their new bonds into additional common stock, principally as a protection against inflation. I agree with the Master that the plan reaches the limit of fairness in the sacrifices is imposes on the preferred stockholders. The bondholders are amply protected against inflation by the award to them of 80 per cent of the equity of the new company. In fairness to the present preferred stockholders, the bondholders could be given an additional conversion privilege only if they were prepared to give up some of their large immediate premium. There is certainly no evidence of a desire to make such a concession. On the contrary, the Burns Committee, representing almost half the bonds, has recorded itself as opposed to the conversion proposal.

This disposes of all questions except those relating to the voting trust.

The exceptional factors in this case calling for a voting trust are presented clearly and in detail in the Master's report. The Master concluded that a voting trust is not only desirable here, but necessary.

■ Briefly stated, the situation is that the great body of the present bondholders and preferred stockholders has never before exercised any voice in the management and control of the Debtor. Before 1935, control was held by the individual founders of the company. In 1935, exclusive control was acquired, at considerable expense, by the Baltimore and Ohio and Reading railroads through their jointly owned subsidiary, Philadelphia Perishable Products Terminal Company, which held all the voting stock after 1935. There is no evidence of impropriety in the exercise of this control, but it is patent that the management permitted by the Terminal

---

[1] The foregoing figures do not take into account interest on the bonds from the close of 1946 to consummation of the plan. But this interest (which runs at the rate of approximately $50,000 per year) will be fully offset by current earnings (approximately $112,000 per year before interest) in which bondholders will acquire an 80 per cent share.

Company to operate the Debtor after 1935 was lax and incompetent, as the history of the so-called Titman transaction makes plain. Fundamentally, the cause of this appears to be that the railroads' interest in the Debtor is not investor's interest. Their concern is primarily to secure the survival of an important facility on their lines. Profit from their investment in the Debtor is a secondary consideration.

The Perishable Products Terminal Company now holds nearly 25 per cent of both the first mortgage bond issue and the preferred stock, and will accordingly acquire in a single block one-fourth of the new common shares. The balance will be scattered among some 700 individual bondholders and stockholders, most of them located outside the Philadelphia area (some as far away as the Pacific coast) whose individual holdings are small, and who have never before organized for control of the company or had any experience in so doing. With the dissolution of the protective committees on consummation of the plan, a reversion of control to the strong minority railroad holdings is a strong likelihood.

Further, the plan necessarily leaves great leeway to management. Wide discretion must be given management to invest profits in plant improvements. The fixed interest is low, and the return to security-holders will primarily depend on discretionary declaration of dividends. While this is all essential under the Debtor's circumstances, it is equally important that the security-holders, or some agency representing them, should be in a position to exercise an effective check on management in the interest of securing a maximum return to the investors. The railroads have not been primarily activated by that interest.

For these reasons, the plan provides for a voting trust of three trustees, who will be required to function, not merely as repositories of the voting power, but actively, as an executive committee closely supervising the operations and policies of the business, conferring frequently with each other and with the management, and making periodic reports to the security-holders. In the trustees, the voting trust will further serve to associate with the new company in a close capacity, men whose special experience and contacts will be valuable in the years ahead.

The plan safeguards the interests of security-holders by requiring referenda to be conducted on matters of major importance, and by providing that the trust may be terminated at any time on the vote of a majority of the voting trust certificates outstanding.

The representatives of more than three-fourths of the present bondholders actively support and desire a voting trust. No security-holder opposes it. The Burns Committee, representing nearly half the bonds, has stated of record that it will oppose any plan that does not include a voting trust. The sole objection is made by the Securities and Exchange Commission.

██ The Commission's objections are fundamentally based on opposition to voting trusts generally and on principle. I have carefully considered the argument ably presented by the Commission's counsel, but I cannot agree that the creation of a voting trust amounts to the same thing as issuing non-voting stock, or that Congress in prohibiting non-voting stock inferentially intended to prohibit voting trusts. There is a wide difference between disfranchising a class of stockholders completely, and designating trustees to exercise the voting power of the class in the interest of that class. Moreover, in Section 216(11) of the Act, Congress expressly provided for scrutiny of the manner of selection of "the persons who are to be directors, officers, or voting trustees, if any, upon the consummation of the plan". From this it seems clear that Congress recognized the voting trust as a useful instrument in reorganization and intended it to be used when called for. See also In re Lower Broadway Properties, supra.

██ I agree that voting trusts should be employed sparingly and only when special circumstances require. But I think that such circumstances clearly exist in this case. I also agree that a voting trust is "undemocratic" if the stockholders are helplessly shackled to it. But in this case the trust excludes minority control only.

Whenever a majority organize and assert themselves, the continuance of the trust is wholly subject to their will.

I conclude that the voting trust provisions are a desirable and necessary part of this plan, ingeniously devised to secure many benefits to the new company, and surrounded with adequate and proper safeguards of the interest of the stockholders.

Various parties in interest have proposed changes in certain of the voting trust provisions:

■ 1. Clifford T. Kelsh and Ethel D. Kulp, holders of $38,000 in bonds and 2,200 shares of preferred stock, while not disputing the desirability of a voting trust, propose that each security-holder be given the option to elect whether he will deposit his new stock in the voting trust. If the majority elect to do so, the trust would become operative, but only as to those so electing.

I believe the proponents of the proposal basically intend it as a sort of separate referendum to make sure that a majority of the security-holders are in favor of a voting trust. But under the circumstances of this case, I think such a separate referendum is clearly unnecessary. The representatives of three-fourths of the bondholders are in court supporting a voting trust. The Burns Committee, representing nearly half the bondholders, has stated that it will oppose any plan which does not embody a voting trust. Counsel for the proponents of the proposal stated during the plan hearing that in his opinion "much more than a majority will vote for the voting trust."

And the proposal, as made, does not envisage a referendum that would be binding to all concerned. Any security-holder might withhold his stock from the trust, whatever the majority do. Some security-holders, seeking a private advantage in marketability or price, would undoubtedly be encouraged to take advantage of such an opportunity. This would be manifestly unfair to the majority, and would produce the unsatisfactory result of a voting trust that is only partially effective, with some stock in it and some outside. The plan cannot be consummated without the approval of two-thirds of the bondholders and a majority of the preferred stockholders. Under all the circumstances, I think this provides sufficient guarantee that a voting trust will not be effected against the will of the security-holders.

■ 2. The plan permits the voting trust to run for the statutory period of 10 years. It is suggested that a five-year limit should be imposed. But under the plan, a majority of the stockholders will have the power to terminate the trust at any time. With such power in a majority of the parties in interest, it seems unwise to place an arbitrary short-term limit on the trust.

■ 3. The Burns Committee urges that the voting trustees should automatically be members of the board of directors. There appears to be no valid objection to this proposal, and I approve it.

■ 4. The Carter-Gregory Committee proposes that individual voting trustees should be subject to replacement on majority vote of the outstanding voting trust certificates. After careful consideration, I agree with the Master that such a provision would not be advisable in this case. Under the plan, the voting trust will at all times be subject to the control of a majority of the certificate-holders, who will have the power to terminate it at will. All the proposal would add is the opportunity for a campaign among certificate-holders directed against an individual trustee.

The present voting trust is unusual. The trustees are expected to function as a supervisory committee actively participating in the management of the business. To such a function, harmony on the committee is essential. The committee must function as a unit, and to be properly constituted must be selected as a unit, to form a well-balanced team of men whose diverse qualifications will supplement and complement each other. As will appear below, this has been a major factor in the selection of the trustees to be designated in the plan. As will also appear, the trustees have been openly selected after full opportunity to all security-holders to make nominations, and after extended consideration and open debate in which the

representatives of the great bulk of the security-holders participated. The trustees who will be designated in the plan have the overwhelming support of the security-holders' representatives. In view of these precautions, I think it would do more harm than good to open the door to attacks on individual trustees.

5. The Carter-Gregory Committee has objected to the plan's exculpatory clause applying to the voting trustees. This matter has become academic since the voting trustees will serve as directors and will be subject to all fiduciary responsibilities accordingly.

6. The Carter-Gregory Committee proposes that the Compensation of the voting trustees be reduced from $3,000 each per annum to $2,000. This proposal is not supported by any other group, and is opposed by the Burns Committee. As already emphasized, the voting trustees are required to act as a responsible committee actively supervising the operation of the business, meeting frequently and concerning themselves continuously and intimately with its affairs. Having regard to the activity thus required, the calibre of the men designated below to be the voting trustees, and the benefits likely to be gained by their association, I find that the compensation provided in the plan is not unreasonable.

7. The Carter-Gregory Committee's suggested modifications of the paragraph relating to expenses of the voting trust are covered by the Trustee's amendments.

There remains the matter of designation of the voting trustees. The plan provides that the trustees shall be designated prior to its submission to the vote of the security-holders, and this seems to me to be highly desirable. In voting, the security-holders will know exactly who will be their trustees if they approve the plan.

To this end, all security-holders were advised in the notice of the plan hearing that the voting trustees would be designated in the plan, and that nominations might be made by any party in interest at the plan hearing. This notice was given nearly a month in advance of the opening of the plan hearing and nearly two months before the last hearing.

After careful consideration of the nominations made, the Master has recommended the designation of Maurice A. Kendall, Laurence T. Howell and Harold Hogeland. Each of these nominees presents excellent qualifications, and, together they make an unusually well-balanced group, which is of major importance.

Mr. Kendall, the present Trustee of the Debtor, received from the outset the unanimous endorsement of all parties in interest. He has proved an unusually conscientious and able Trustee, and in his five years of service in that capacity has obtained an extensive and intimate knowledge of the Debtor's affairs and problems that will be essential to the intended functions of the voting trust.

Mr. Howell is president of one of the largest "dry" warehousing corporations in the Philadelphia area, an enterprise very similar to cold storage but not in competition with it. His experienced knowledge of warehousing and his contacts among the customers of the industry are of great importance.

Mr. Hogeland is vice-president of a large Philadelphia banking institution in direct charge of its highly developed commodity loan department. Commodity loans, and the storage of commodities subject to such loans, are of major importance to a cold storage business. Mr. Hogeland has expert knowledge and important contacts in that field, as well as wide general financial experience.

Both Mr. Hogeland and Mr. Howell were from the start recommended by large groups of security-holders. Three other nominations were made. The Burns Committee and the Carter-Gregory Committee strongly pressed their claims to nominate members of their committees to the voting trust panel. The petitioning creditors also nominated Mr. Paul Hicks. But the situation has been crystallized and clarified, following conferences with the court, by the Burns Committee's voluntary withdrawal of its strong and justifiable claim to direct representation on the trust, in favor of the well-balanced panel recommended by the Master, which the Commit-

tee concluded would best serve the diverse needs of the new company. In so acting, the Burns Committee afforded a remarkable demonstration of disinterested and sincere purpose, for which it deserves the commendation and appreciation of all concerned.

In view of the action of the Burns Committee, the petitioning creditors in the same spirit withdrew the nomination of Mr. Hicks, and joined in the Master's recommendations. The nominees so recommended have accordingly now received the solid support of the representatives of 75 per cent of the bondholders. Under those circumstances, in view of the action taken by the Burns Committee and the excellent and desirable qualifications of the nominees so supported, I designate Messrs. Kendall, Howell and Hogeland to be the voting trustees under the plan.

Pursuant to the withdrawal of its request to direct representation on the voting trust, the Burns Committee has proposed that the plan be amended to provide that the board of directors of the reorganized company shall consist of the three voting trustees, Mr. Burns and Mr. Kirkland (members of the Burns Committee) and two other members to be designated later by the court. The Committee also proposes that the voting trustees shall keep a record of their meetings and of action taken or agreed upon by them, such record to be available to directors; that the voting trustees meet with directors on request; that the board of directors hold stated monthly meetings and the members receive compensation of $25 per meeting and travelling expenses if non-residents of Philadelphia.

It is in the highest degree desirable that the bondholders have direct representation on the board of directors through their selected representatives, Mr. Burns and Mr. Kirkland, representing nearly half the bondholders, are logical and desirable choices to serve this purpose, and both are excellently qualified to make valuable contributions to the administration of the new company. The further suggestions mentioned are appropriate and desirable, and all of the amendments so proposed are accordingly approved.

Except to the extent stated above, the exceptions filed to the Master's report are dismissed and the Trustee's plan of reorganization will be approved subject to the amendments herein adopted.

On notice to all counsel, the Trustee will submit appropriate formal amendments to the plan and a form of order of approval.