**In re AHEAD COMMUNICATIONS SYSTEMS, INC., Debtor.**

**Bankruptcy No. 02–30574.**
**Civil Action No. 3:05–CV–1713 (CFD).**

United States District Court,
D. Connecticut.

Oct. 17, 2008.

Craig I. Lifland, Lawrence S. Grossman,
Zeisler and Zeisler, Bridgeport, CT, Dean

W. Baker, Law Offices of Dean W. Baker, New Haven, CT, Kenneth Hicks, Weisman, Celler, Spett & Modlin, P.C., New York, NY, Mark I. Fishman, Pepe & Hazard, Southport, CT, for Debtors.

## *RULING ON BANKRUPTCY APPEAL*

CHRISTOPHER F. DRONEY, District Judge.

General DataComm, Inc. ("GDC") appeals from two orders of the United States Bankruptcy Court for the District of Connecticut, which granted the Fifth Interim Fee Application of the law firm Zeisler & Zeisler, P.C. ("Zeisler"), attorneys for Ahead Communications Systems, Inc. ("Ahead" or "Debtor"), and overruled GDC's Objection and Supplemental Objection to the Fifth Interim Fee Application.[1] GDC argues that Zeisler should not have been compensated for its work preparing and filing the Debtor's Plan of Reorganization dated June 17, 2004 ("Debtor's Plan") because Zeisler knew or reasonably should have known that the Debtor's Plan violated 11 U.S.C. §§ 1123(a)(6), 1123(a)(7), and 1129(a)(1) and was not confirmable as a matter of law. This Court finds that

1. the Bankruptcy Court's conclusion that the fees sought by Zeisler were "reasonably likely to benefit the debtor's estate" was based on an erroneous conclusion of law as to the litigability of a proposed reorganization plan that is in clear violation of 11 U.S.C. § 1123(a)(6);

2. the Debtor's Plan provided for the issuance of non-voting securities, disenfranchising the debtor's sole secured creditor in violation of both the plain text and the purposes of 11 U.S.C. § 1123(a)(6);

3. the Debtor's Plan did not create a voting trust, and did not in any other way adequately protect the interests of the secured creditors, and therefore no ambiguity as to the permissibility of voting trusts or the definition of nonvoting securities under 11 U.S.C. § 1123(a)(6) could have saved the Debtor's Plan or created a litigable issue as to its validity; and

4. Zeisler reasonably should have known that the Debtor's Plan could not be confirmed, and therefore its activities in preparing and filing the plan were not "reasonably likely to benefit the debtor's estate" as required for an award of fees under 11 U.S.C. § 330(a)(4)(A)(ii)(I).

Zeisler is therefore not entitled to a fee award for the portion of its services that related to the preparation of the Debtor's Plan.[2]

---

1. Amended Order of Bankruptcy Judge Lorraine Murphy Weil, case number 02–30574(LMW), dated October 14, 2005, and Order dated October 14, 2005.

2. GDC states in its brief that Zeisler has been awarded fees and expenses totaling $841,005.94, of which $188,983 relates to work on the Debtor's Plan. Although GDC makes no reference to Zeisler's fees relating to litigation of the Valuation Motion initiated by GDC, Zeisler argues in its brief that it should be awarded fees for services that included (1) litigating the GDC Valuation Motion and (2) preparing and filing the Debtor's Plan. As the parties have not submitted the Fifth Interim Fee Application as part of the record, this Court makes no findings as to which portion of the disputed amount, if any, relates to the litigation of the Valuation Motion.

While the Court finds that Zeisler's preparation of a plan that was unconfirmable due to violation of § 1123(a)(6) was not reasonably likely to benefit the estate, the Court does not extend that holding to Zeisler's work litigating the Valuation Motion, which was initiated by GDC, and a response to which was not only "reasonably likely to benefit the estate" but also necessary to the responsible representation of Ahead in its role as Debtor–

## I. Background[3]

On February 7, 2002, Ahead Communications Systems, Inc. ("Ahead" or "Debtor") filed a voluntary petition for relief pursuant to Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* in the United States Bankruptcy Court for the District of Connecticut. Throughout the case, Ahead continued to operate and manage its business as a Debtor–In–Possession in accordance with Sections 1107 and 1108 of the Bankruptcy Code. GDC was Ahead's largest single creditor and its only secured creditor, holding a total secured debt of approximately $16 million. The total amount of Ahead's unsecured debt was approximately $2.8 million.[4]

GDC and the Official Committee of Unsecured Creditors of the Debtor filed a plan of reorganization (the "GDC Plan") in May, 2004. In June 2004 Zeisler filed the Debtor's Plan and disclosure statement, which included payment to each unsecured creditor of a pro-rata share of a lump sum of $1,000,000. The Debtor's Plan also provided that GDC's secured claim would be converted into a ten-year note, with principal and interest payable monthly and a final balloon payment at the end of three years. Under the Debtor's Plan, New Common Stock would be issued to GDC, making GDC the Debtor's sole common stockholder. However, the stock would be held in escrow and subject to a voting restriction which provided that no voting rights would be exercisable by GDC (nor by anyone else) unless the Debtor defaulted on the monthly payments or the balloon payment, or repaid the note in full. Upon default or complete repayment, the common stock would be released to GDC and the voting restriction would terminate. The Debtor's Plan also required the Debtor to file an amended and restated certificate of incorporation providing for the authorization and issuance of the New Common Stock and such other terms "as necessary to satisfy the provisions of this Plan."

GDC has objected to the Debtor's Plan on several bases,[5] including in this appeal the objection that the voting restrictions imposed on the New Common Stock violated 11 U.S.C. § 1123(a)(6), which requires that "a plan shall provide for the inclusion in the charter of the debtor . . . of a provision prohibiting the issuance of nonvoting equity securities" and § 1123(a)(7), which requires a plan to "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." 11 U.S.C. § 1123(a)(7). The Bankruptcy

in–Possession. The Bankruptcy Court did not abuse its discretion or make erroneous conclusions of law in awarding these fees and its decision with respect to the litigation-related fees is affirmed.

3. The Court assumes the parties' familiarity with the facts of the case, which are contained in the record and which it has given due consideration, and therefore summarizes and somewhat simplifies its recitation of the facts relevant to this appeal.

4. Disputes regarding the unsecured debt owed to GDC and potentially· affecting the exact amount of secured and unsecured debt held by GDC are not material to this appeal.

5. Zeisler has argued that GDC's current objection exceeds the scope of objections to which GDC earlier agreed it would limit itself. However, the Bankruptcy Court decided to allow GDC's objection because GDC had not made an unambiguous waiver of its right to make the objection, and this Court declines to revisit the issue of waiver. *See* Transcript of Hearing on Fifth Interim Application for Compensation, Docket # 518, Filed Sept. 19, 2005, at 66.

Court overruled GDC's objection on October 11, 2005.[6]

## II. Standard of Review

■ Bankruptcy courts enjoy considerable discretion in determining reasonable fee awards. This discretion will not be disturbed by an appellate court absent a showing that the court's discretion was abused. *In re JLM, Inc.*, 210 B.R. 19, 23 (2nd Cir.BAP1997) (citing *Dickinson Indus. Site v. Cowan*, 309 U.S. 382, 389, 60 S.Ct. 595, 84 L.Ed. 819 (1940); *Casco N. Bank v. DN Assocs. (In re DN Assocs.)*, 3 F.3d 512, 515 (1st Cir.1993)). "An abuse of discretion arises where (1) the bankruptcy judge fails to apply the proper legal standard or follows improper procedures in determining the fee award, or (2) bases an award on findings of fact that are clearly erroneous." *In re JLM*, 210 B.R. at 23

(citing *In re Hunt*, 196 B.R. 356, 358 (N.D.Tex.1996); *In re First Colonial Corp. of Am.*, 544 F.2d 1291, 1298 (5th Cir.), cert. denied, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977)). Under the "abuse of discretion" standard, an appellate court may not make its own factual findings or choose between conflicting reasonable inferences. *In re JLM*, 210 B.R. at 23 (citing *South St. Seaport Ltd. v. Burger Boys, Inc.*, 94 F.3d 755, 762 (2d Cir.1996)). Conclusions of law are reviewed *de novo*, and factual findings are reviewed under a "clearly erroneous" standard. *In re JLM*, 210 B.R. at 23 (citing *Nat'l Union Fire Ins. Co. of Pittsburgh v. Bonnanzio*, 91 F.3d 296, 300 (2d Cir.1996)); Fed. R. Bankr.P. 8013. A district court may "affirm, modify, or reverse a bankruptcy court's judgment, order, or decree or remand with instructions for further proceedings." Fed. R. Bankr.P. 8013.

---

**6.** The Bankruptcy Court articulated the basis for its ruling as follows:

> To be compensable, fees for which payment is sought by a Chapter 11 debtor-in-possession's counsel must be reasonably likely to benefit the debtor's estate or necessary to the [ ] administration of the case. 11 U.S.C. [§ ]330(a)(4)(ii). The burden is on the applicant to demonstrate the reasonableness of its fees. *In re Charles A. Stevens and Co.*, 109 B.R. 853 at 854 (Bankr. N.D.Ill.).
>
> The standard to determine reasonableness in situations like this is set forth in the following quote[:] 'The appropriate [perspective] for determining the necessity of the activity should be prospective. Hours for an activity or project should be disallowed only where a court is convinced it is readily apparent that no reasonable attorney should have undertaken that activity or project [ ].' This is especially true where after the fact matters have ultimately been resolved by consent. The court's benefit of [ ] '20/20 hindsight' should not penalize professionals. *In re Drexel Burnham Lambert Group, Inc.*, 133 B.R. 13 at 23 (Bankr. S.D.N.Y.1991). *See also In re Cenargo Int'l*

*PLC*, 294 B.R. 571 at 595 (Bankr.S.D.N.Y. 2003) ("the focus is on what a reasonable lawyer would have done at the time; the court should not invoke perfect hindsight.").

The court has reviewed the authorities discussed on pages 11 through 20 of Zeisler & Zeisler's most recent memorandum, and a section of the well-respected treatise on bankruptcy law, 7 *Collier on Bankruptcy*, Section 1123.01(6)(b) at 1123–15 at note 37, 15th Ed. Revised 2005, and it [is] persuaded that an attorney in Zeisler & Zeisler's position could have reasonably thought that confirmation of the Ahead plan with its stock voting provisions presented a litigable issue under Bankruptcy Code sections 1129(a)(1), 1129(a)(6) and 1129(a)(7).

The court will not indicate how the court ultimately would have ruled. All that is required for the court is to find that there was a litigable issue, and the court so finds. The court has determined that *In re Office Products of America, Inc.*, 136 B.R. 983 (Bankr.W.D.Tex.1992), is factually inapposite.

Transcript of Hearing before Bankruptcy Judge Lorraine Murphy Weil, Oct. 11, 2005 ("Hearing Transcript"), at 53–54.

## III. Discussion

The Bankruptcy Court's fee decision was based on an erroneous conclusion of law with respect to the litigability of the Debtor's Plan's creation of new non-voting stock. The Bankruptcy Court's holding implies that a reasonable attorney could have believed that a plan that creates non-voting stock, in violation of 1123(a)(6)'s plain meaning, *might* be confirmable—a conclusion that this Court finds is incorrect and which will be discussed below.[7]

### A. *The Standard for an Award of Fees to the Attorneys for a Debtor–in–Possession*

■ The Bankruptcy Code provides that the court "may award to a trustee . . . or a professional person employed under section 327 reasonable compensation for actual, necessary services rendered. . . ." 11 U.S.C. § 330(a)(1)(A). The court may also "award compensation that is less than the amount of compensation that is requested."[8] 11 U.S.C. § 330(a)(2). In determining the amount of compensation to be awarded, the court "shall consider the nature, the extent, and the value of such services, taking into account all relevant

factors, including . . . whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title." 11 U.S.C. § 330(a)(3)(C). However, "the court shall not allow compensation for . . . services that were not (I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the estate." 11 U.S.C. § 330(a)(4)(A)(ii). The Second Circuit has held that the "reasonably likely to benefit the estate" standard for an award of attorney's fees, as articulated in 11 U.S.C. § 330, must be applied in an objective manner, and the court must make sufficient factual findings, on the record, upon which to base its decision. *In re JLM*, 210 B.R. at 27 (citing *In re Ames Dep't. Stores, Inc.*, 76 F.3d 66, 72 (2d Cir.1996)).

### B. *Sections 1123(a)(6) and 1123(a)(7)*

■ The decision of the Bankruptcy Court was based solely on its conclusion of law as to the import of sections 1123(a)(6) and 1123(a)(7), namely, that a plan such as that proposed by Zeisler presented a litigable issue under these sections. Subsec-

---

7. The parties dispute whether the appropriate standard of review in this case is *de novo*, as for a Bankruptcy Court's decisions of law, or abuse of discretion, which applies to decisions regarding reasonable fee awards. The Court chooses to address *de novo* the legal conclusions reached by the Bankruptcy Court, but notes that the result in this case would likely be the same under the latter standard, based in part on (1) the brevity of the Bankruptcy Court's holding and the insufficient factual basis placed on the record during that holding; and (2) the Bankruptcy Court's improper application of the "reasonably likely to benefit the estate" standard articulated in 11 U.S.C. § 330(a) (regarding an award of fees to the attorneys for a Debtor–in–Possession).

8. Although a debtor's own bankruptcy attorneys may not be paid from the assets of the estate, a debtor-in-possession acts in the place

of a bankruptcy trustee in maintaining control over the estate assets (the corporation) and managing them for the benefit of the estate during a Chapter 11 reorganization. *See Dickinson Indus. Site v. Cowan*, 309 U.S. 382, 388–89, 60 S.Ct. 595, 84 L.Ed. 819 (1940) (noting that the abuse of discretion standard applies to a bankruptcy court's fee award decision because fee claimants are "either officers of the court or fiduciaries . . . whose claims . . . are based only on service rendered to and benefits received by the estate.") Accordingly, an attorney for a debtor-in-possession may seek compensation as a "professional person" under 11 U.S.C. § 330 and subject to the conditions outlined in that section. In re Office Prods. of America, Inc., 136 B.R. 983, 984–85 and n. 1 (Bankr.W.D.Texas, 1992).

tion (a) of 11 U.S.C. § 1123 contains mandatory provisions for every reorganization plan under Chapter 11 bankruptcy. Section 1123(a)(6) requires a plan to "provide for inclusion in the charter of the debtor, if the debtor is a corporation ... of a provision prohibiting the issuance of nonvoting equity securities." 11 U.S.C. § 1123(a)(6). "This section codifies a position long supported by the Securities and Exchange Commission that participation in, and control of, the selection of management of a reorganized debtor must be considered as part of a fair and equitable plan and provided for accordingly." 7 *Collier on Bankruptcy* P.1123.01. "[T]he securities must be distributed so that the allocation of voting power—i.e., the control of the company—properly recognizes the respective position of the claimants and stockholders according to their rank and the rights they surrender. Consequently, creditors who are forced to take stock in the new company, or whose rights as creditors are modified or altered so they assume some risk of the success of the reorganized corporation, are entitled to an allocation of voting power and a voice in the selection of management that will protect their interests." *Id.*

The prohibition against issuing nonvoting securities was intended to ensure that investors were able to maintain a voice in the selection of management of the reorganized firm. See Richard L. Epling, "Fun With Nonvoting Stock," 10 *Bankr.Dev. J.* 17, 19–23 (1993). The drafters of section 1123(a)(6) expressed concern with ensuring "fair and equitable reorganization," which "is literally the last chance to conserve for [the investors] values that corporate financial stress or insolvency have placed in jeopardy." *Id.* at 21 (quoting S.Rep. No. 989, 95th Cong., 2d Sess. 11 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5797).

While the term "nonvoting" is not clear in its meaning, "it is clear that section 1123(a)(6) prevents the issuance of a class of stock without the possibility of exercising any vote." 7 *Collier on Bankruptcy* P.1123.01. In *In re Tharp Ice Cream Co.,* an early bankruptcy case, the Court disallowed a reorganization plan that purported to restrict, for two years, the voting rights of preferred stockholders. 25 F.Supp. 417 (E.D.Pa.1938). Although that plan would have given preferred stockholders the right to vote if the debtor defaulted on its preferred dividend payments, the Court held the voting restriction to be impermissible under Section 216(12) of the Bankruptcy Act of 1898, the predecessor to section 1123(a)(6).

▪ In contrast, voting trusts, which are created when stockholders sign a voting trust agreement granting their voting rights to a trustee for a specified and irrevocable period of time, are valid under 1123(a)(6). *In re Lower Broadway Props.,* 58 F.Supp. 615, 619 (D.C.N.Y.1945). The trustee of a voting trust is typically charged with holding and voting the shares for the benefit of the beneficiaries. "[T]here is a wide difference between disenfranchising a class of stockholders completely, and designating trustees to exercise the voting power of the class in the interest of that class." *In re Quaker City Cold Storage Co.,* 71 F.Supp. 124, 131 (E.D.Pa.1947).

▪ The Bankruptcy Code does not leave the practitioner or the courts without guidance, however, in interpreting the meaning of 1126(a)(6). "Sections 1123(a)(6) and 1123(a)(7) must be read together." *In re Acequia, Inc.,* 787 F.2d 1352, 1361 (9th Cir.1986). Section 1123(a)(7) requires a plan to

contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trus-

tee under the plan and any successor to such officer, director, or trustee.

11 U.S.C. § 1123(a)(7). This section requires courts to deny confirmation of a plan that unreasonably restricts a stockholder's voting rights in a way contrary to public policy with respect to the election of an officer, director, or trustee. *In re Mahoney*, 80 B.R. 197, 201 (Bankr.S.D.Cal. 1987) (citing M. Krotinger, "Management And Allocation Of Voting Power In Corporate Reorganizations," 41 *Colum. L.Rev.* 646, 665 (1941)). When read together, 1123(a)(6) and (a)(7) "require that the court scrutinize *any* plan which alters voting rights or establishes management in connection with a plan of reorganization, whether or not the plan provides for issuance of new securities." *In re Acequia*, 787 F.2d at 1361. When former creditors are not given voting power proportionate to the rights they are forced to relinquish (i.e. seniority with respect to former junior creditors or former equity shareholders), the court will "trim down" the voting power of the old junior interests accordingly. Krotinger at 665 (citing *In re Tharp Ice Cream Co.*, 25 F.Supp. 417).

C. *Evaluation of the Debtor's Plan in Light of §§ 1123(a)(6) and 1123(a)(7)*

 The provision of the Debtor's Plan that describes its proposed treatment of the claims and interests provides that GDC's secured claim would be converted to (a) a ten-year-maturity note payable over three years, and (b) new common stock to be placed in an escrow account under control of counsel and carrying no voting power unless and until either (1) the note was repaid in full (at the end of three years) or (2) the Debtor defaulted on a payment. Debtor's Plan at 9–10. The Plan also dictated that the Debtor's post-confirmation board of directors would include (1) the existing President of Ahead,

(2) a representative of GDC, who would be removed from the board upon repayment of GDC's secured claim, and (3) an industry expert chosen by Ahead's President and the GDC representative, or by Ahead's President if the two could not agree. The Debtor's Plan therefore guaranteed that GDC would maintain only minority status, and that neither GDC nor anyone else would be empowered to vote to change the board's composition for three years, absent default on the loan payments, despite the fact that during that time GDC would be the sole equity shareholder in the new company, and its largest creditor.

Zeisler claims that the Debtor's Plan had the same intention as a voting trust, which arguably would have been permissible (or at least litigable) under § 1123(a)(6), but this assertion finds no support in the record. The plain fact is that the Debtor's Plan did not create a voting trust, which would have required a formal voting trust agreement and voting rights exercisable by some trustee holding the duty of voting in the best interests of the creditors. Under the Debtor's Plan, no one would have voting rights for up to three years, or until it would be too late to protect the secured interest from the possibility of default. The Plan did not in any other way adequately protect the interests of the secured creditor in maintaining some control over the business on which it would depend for repayment of its claim. Instead, it served to convert the secured claim of GDC into an unsecured note without any mitigating control over the management of the company charged with repaying that note. Therefore no ambiguity as to the permissibility of voting trusts under 11 U.S.C. § 1123(a)(6) could have saved the Debtor's Plan or created a litigable issue as to its validity.

Zeisler's characterizations of the Debtor's Plan notwithstanding, this plan plainly provided for the issuance of non-voting securities, disenfranchising the debtor's sole secured creditor in violation of both the plain text and the purposes of 11 U.S.C. § 1123(a)(6), and failed to protect GDC's rights both as sole shareholder and as sole secured creditor. The fact that the new note ostensibly provided for "payment in full" of the creditor's secured claim is irrelevant in light of its impermissible issuance of nonvoting stock. Similarly, Zeisler's claim that the plan could have been amended does not cure the harm to the estate that flows from an award of attorney's fees for both the preparation of an obviously defective plan and the additional expense of negotiating a correction to its key provisions, i.e., those dealing with the claims of the only secured creditor and equity shareholder. These actions were directly against the interests of the estate and served only to benefit the officers of Ahead, who would be ensured a place in management unencumbered by accountability to the vote of the equity shareholder, and Zeisler itself, which would benefit from the award of fees at the expense of the estate's assets. Therefore no ambiguity about the meaning of "non-voting securities" under § 1123(a)(6) could have created any litigable issue with respect to the provisions of the Debtor's Plan.

The Court finds that Zeisler reasonably should have known that the Debtor's Plan could not be confirmed, and therefore its activities in preparing and filing the plan were not "beneficial at the time rendered," nor were they "reasonably likely to benefit the debtor's estate" as required for an award of fees under 11 U.S.C.

9. Zeisler's suggestion that GDC had a duty to inform Zeisler of the plan's illegality are irrelevant as no such duty existed. As to Zeisler's argument that GDC's delay in objecting to the plan's illegality rendered Zeisler's services

§ 330(a)(3)(c). *In re JLM, Inc.*, 210 B.R. 19, 24 (2d Cir. BAP 1997).[9]

## IV. Conclusion

For the foregoing reasons, the order of the bankruptcy court is REVERSED and the case is remanded for further proceedings in accordance with this opinion.

"reasonably likely to benefit the debtor's estate" is addressed by the Court's affirmation of the Bankruptcy Court fee award as to the Valuation Motion, discussed *supra* at note 2.