THOMPSON, Circuit Judge:
 

 Vernon B. Clinton (“Clinton”), a 50% equity security holder of Acequia, Inc. (“the Debtor”), appeals from the district court’s order affirming the bankruptcy court’s confirmation of the Debtor’s proposed Second Amended Plan of Reorganization (the “Plan”). We affirm.
 

 FACTS
 

 The Debtor, a family-owned corporation, was incorporated in 1974 under Idaho law. All of its outstanding shares of capital stock were registered in Clinton’s sole name. Although the Debtor was initially organized to conduct farming operations, land management subsequently became its principal business activity. In October 1981 Clinton and his wife, Rosemary Haley (“Haley”) obtained a divorce. Under the terms of the marital settlement agreement and decree of divorce, Clinton and Haley divided substantially all of their assets, including the shares of stock in the Debtor. One-half of the shares of stock in the Debt- or were transferred to Clinton and one-half to Haley.
 

 In July 1982 the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code (the “Code”). At the time of the filing, Clinton continued to control the day-to-day operations of the Debtor. However, the relationship between Clinton and Haley had become acrimonious. Haley refused to attest to the accuracy of the Debtor’s Schedules and Statement of Affairs and sent a letter to Presiding Bankruptcy Judge Merlin S. Young alleging that Clinton had willfully failed to disclose pertinent information and had mismanaged the Debt- or. Haley also alleged she had been denied access to the Debtor’s books and records. Haley requested and was granted authority to take depositions of Clinton, and the Debtor’s accountant and auditor concerning the accuracy of the Schedules and Statement of Affairs. After taking the depositions, Haley applied to the bankruptcy court for the appointment of a trustee (the “Application”). The Application alleged that Clinton had persisted in failing to disclose the Debtor’s affairs and had mismanaged the Debtor. Prudential Insurance Company of America and Seattle First National Bank, two secured creditors, also applied for appointment of a trustee alleging Clinton’s failure to disclose corporate assets and personal transactions with the Debtor.
 

 The hearing on the Application (the “Trustee Hearing”) was held in December of 1982. The Debtor, Haley, and Clinton each appeared with separate counsel. At the beginning of the hearing, Clinton’s attorney objected to certain testimony. Judge Young asked the attorney whom he was representing, and counsel responded that he was representing the “personal interests” of Clinton. Judge Young stated that Clinton’s activities as an officer of the
 
 *1356
 
 Debtor, and not his personal liability, were at issue, and that Clinton had no “standing” to raise matters of personal liability.
 
 [1]
 
 Judge Young ruled that the Debtor’s attorney could adequately represent the Debtor, and that Clinton’s attorney could not make objections or present testimony, but could advise Clinton during his testimony on matters of personal liability.
 

 At the Trustee Hearing, Haley entered into evidence a number of documents which indicated that in schedules which Clinton had filed on behalf of the Debtor, Clinton had failed to disclose that he had withdrawn more than $1.6 million in cash from the Debtor. He contended that these withdrawals had been made to repay himself money he had lent to the Debtor, but the Debtor’s tax returns did not reflect such loans. Also, the auditor who had reviewed the records of the Debtor pursuant to the marital settlement agreement and decree of divorce testified that at the time the Debtor’s petition and schedules had been prepared and filed, Clinton had failed to disclose and had ordered the auditor to withhold information concerning the exist ence of several assets which, according to the auditor, belonged to the Debtor and had values that exceeded $1 million. The auditor characterized these nondisclosures as “grossly misleading” and “fraudulent.”
 

 Notwithstanding Judge Young’s ruling that Clinton's attorney would not be permitted to represent Clinton’s individual interests at the Trustee Hearing, as the hearing progressed his counsel raised several objections, including an objection to the auditor’s testimony regarding Clinton’s nondisclosures.
 
 [2]
 
 Clinton’s attorney also addressed the court from time to time, but did not examine or cross-examine witnesses.
 

 After three days of hearing, but before the bankruptcy court ruled on the Application, Clinton, Haley, Prudential Insurance Company, and Seattle First National Bank entered into a stipulation dated December 3, 1982, which became the order of the bankruptcy court. The stipulation and order provided that the Application, together with the secured creditor’s application, would be provisionally withdrawn upon the condition that Clinton deliver to Haley an irrevocable proxy permitting Haley to vote Clinton’s stock in the Debtor and to manage the Debtor for two and one-half years.
 

 In December 1983 the Debtor submitted the Plan and Disclosure Statement. The Disclosure Statement recited the allegations of misconduct considered at the Trustee Hearing, and stated that Haley and her family would continue to control the reorganized Debtor during the penden-cy of the Plan. The Disclosure Statement also specified that creditors would be paid by 1992, primarily through the remittance of rental income and the sale of the Debt- or’s assets. After notice and hearing, Judge Young approved the Disclosure Statement and ordered that the Plan, a ballot, and the Disclosure Statement be mailed to all creditors, equity security holders, and other parties in interest.
 

 The Plan provided details of the sale of assets (the “Sale Provisions”) and management of the Debtor (the “Management Provisions”). The Management Provisions provided that Haley and her two sons would manage the Debtor and serve as its
 
 *1357
 
 directors during the pendency of the Plan. If any director could no longer serve, the other directors would choose a successor. Shareholders were prohibited from removing directors. The Debtor’s articles of incorporation and by-laws would be amended to reflect these provisions. The Plan also classified all shareholders in the same class and stated that the shareholders’ interests were not impaired. Finally, the Plan stated that the bankruptcy court would retain jurisdiction during the pendency of the Plan.
 

 In February of 1984 Judge Young conducted a hearing on confirmation of the Plan (the “Confirmation Hearing”). Clinton appeared with counsel. Although Clinton had voted against and filed an objection to the Plan, he did not offer any evidence or call any witnesses. No other creditor or equity security holder objected to the Plan. The Debtor presented two witnesses to testify on the feasibility of the Plan. At the close of testimony, counsel for the Debtor referred to the evidence presented at the Trustee Hearing on Clinton’s alleged misconduct. Counsel for Clinton objected to the reference, but Judge Young stated that:
 

 I am aware what was presented, I have never ruled upon it, although I was prepared to do so at the time this matter was settled. I do think it has some relevance here because of the peculiar status of this corporation. I will give it whatever weight I think it is worth. I will not totally discard it.
 

 Counsel for the Debtor then proceeded to summarize the testimony presented at the Trustee hearing.
 

 At closing argument, Clinton contended the Management Provisions deprived him of his shareholder voting rights and violated the Code’s provisions on conformity to law, equality of treatment, impairment, and nonvoting securities. Clinton also argued that the Sale Provisions were not feasible. The bankruptcy court ruled that the Plan complied with the Code’s provisions on confirmation, and that the Management Provisions were necessary to preserve the Debt- or's reorganization.
 
 [3]
 
 The bankruptcy court confirmed the Plan and the district court affirmed.
 

 ISSUES
 

 1. Did the bankruptcy court err by considering the evidence presented at the Trustee Hearing in ruling on confirmation?
 

 2. Does the Plan comply with the Code’s requirements governing conformity to law, equality of treatment, impairment, nonvoting securities, and feasibility?
 

 STANDARDS OF REVIEW
 

 Because we are in as good a position as the district court to review the bankruptcy court’s findings, we independently review the bankruptcy court’s decision.
 
 Ragsdale v. Haller,
 
 780 F.2d 794, 795 (9th Cir.1986). We “review ... the bankruptcy court’s findings of fact under the clearly erroneous standard and its conclusions of law
 
 de novo.
 
 ”
 
 Id.; In re Pizza of Hawaii,
 
 761 F.2d 1374, 1377 (9th Cir.1985).
 
 See also
 
 Bankr.R. 8013.
 

 Whether the Code limits the bankruptcy court to consideration of evidence presented at the confirmation hearing in ruling on confirmation is a question of statutory interpretation subject to
 
 de novo
 
 review.
 
 See In re Pacific Far East Line, Inc.,
 
 713 F.2d 476, 478 (9th Cir.1983) (involving statutory interpretation). Similarly, whether the Plan impairs Clinton’s interest is a question of law.
 
 See In re
 
 
 *1358
 

 Madison Hotel Assocs.,
 
 749 F.2d 410, 418 (7th Cir.1984).
 

 The remaining principal issues presented in this appeal — equality of treatment,
 
 [4]
 
 fairness, and feasibility — present questions of fact which we review under the clearly erroneous standard.
 
 See, e.g., In re Pizza of Hawaii,
 
 761 F.2d at 1377 (feasibility);
 
 Citibank, N.A. v. Baer,
 
 651 F.2d 1341, 1346 (10th Cir.1980) (fairness).
 
 [5]
 

 ANALYSIS
 

 A.
 
 Consideration of the Prior Testimony
 

 Clinton contends that the bankruptcy court was not permitted to consider the evidence presented at the Trustee Hearing in ruling on confirmation. Rather, Clinton maintains that a proponent of a plan must demonstrate
 
 at the confirmation hearing
 
 that the plan complies with the provisions of the Code and may not rely upon evidence presented at a prior hearing. He cites provisions in the Code which state that “the court shall hold a hearing on confirmation of a plan,” and that the court shall confirm a plan only if “[t]he plan complies with the applicable provisions of this title.” 11 U.S.C. §§ 1128(a), 1129(a)(1) (1982).
 
 See also In re Featherworks Corp.,
 
 25 B.R. 634, 642 (Bankr.E.D.N.Y.1982) (proponent has burden of demonstrating that the plan complies with Code),
 
 aff'd,
 
 36 B.R. 460 (E.D.N.Y.1984).
 

 The parties have argued at length over whether a bankruptcy court may take “judicial notice” of evidence presented at prior hearings. However, this case does not present an issue of judicial notice. Judicial notice involves recognizing the truth of certain facts. 9 C. Wright & A. Miller,
 
 Federal Practice and Procedure,
 
 § 2410, at 340 (1971 & Supp.1985).
 
 See also
 
 Fed.R.Evid. 201(b). The Debtor never requested that the bankruptcy court take “judicial notice” of the evidence presented at the Trustee Hearing. Further, the record reveals Judge Young did not believe he was taking “judicial notice” of that testimony. Judge Young simply indicated he would consider the prior testimony in ruling on confirmation, and “give it whatever weight I think it is worth.”
 

 We need not rely upon the concept of judicial notice to approve the bankruptcy court’s consideration of evidence presented at the earlier Trustee’s Hearing.
 
 [6]
 
 The bankruptcy court must hold an evidentiary hearing in ruling on confirmation.
 
 See, e.g., Technical Color & Chemical Works, Inc. v. Two Guys From Massapequa, Inc.,
 
 327 F.2d 737, 742 (2d Cir.1964);
 
 In re Aminex Corp.,
 
 15 B.R. 356, 358 n. 4 (Bankr.S.D.N.Y.1981).
 
 See
 
 also Bankr.R. 3020(b)(2).
 
 [7]
 
 But this does not preclude the
 
 *1359
 
 bankruptcy court from considering evidence presented by the parties at prior evidentiary hearings.
 
 See e.g., In re Graco, Inc.,
 
 364 F.2d 257, 260 (2d Cir.1966). In the typical reorganization case, the bankruptcy judge will preside over many hearings in which the court is asked to draw legal conclusions from facts developed at prior proceedings. Here, for example, Judge Young conducted (and Clinton and Haley attended) three hearings in which Clinton’s alleged misconduct was at issue. Judge Young stated that he was familiar with the prior testimony and would consider it in ruling on the Plan. To require the bankruptcy court to ignore prior evidence would impose a harsh and unnecessary administrative burden. We find nothing in either the language or logic of the Code requiring the court or parties to “grind the same corn a second time,”
 
 Aloe Creme Labs., Inc. v. Francine Co.,
 
 425 F.2d 1295, 1296 (5th Cir.1970) (per curiam), and we will not read into the Code the requirement of redundancy.
 

 We also reject Clinton’s contention that the bankruptcy court’s ruling prohibiting participation by Clinton’s counsel at the Trustee Hearing precluded the bankruptcy court from considering, at the Confirmation Hearing, the prior testimony. Clinton never informed the bankruptcy court (at the Trustee hearing) that he might be entitled to participate as a party in interest. 11 U.S.C. § 1109(b) (1982).
 
 [8]
 
 The record reveals that Clinton did not state why he had appeared at that hearing with personal counsel.
 
 [9]
 
 Further, despite Judge Young’s ruling, Clinton’s attorney remained at the hearing and raised several objections.
 

 Moreover, even if the bankruptcy court improperly denied participation by Clinton or his individual counsel at the Trustee Hearing, we must remember this is an appeal from the Confirmation Hearing, not the Trustee Hearing. This court has recognized that prior defects in a bankruptcy case may be cured at the confirmation stage. In
 
 In re Westgate-Califomia Corp.,
 
 634 F.2d 459 (9th Cir.1980), this court ruled that a prior failure to hold an evidentiary hearing was rendered “harmless” because the court considered the pertinent evidence at the confirmation hearing.
 
 Id.
 
 at 462.
 
 See also
 
 Fed.R.Civ.P. 61. Here, Clinton maintains that his inability to examine witnesses and present evidence at the Trustee Hearing so tainted those proceedings that the court could not consider the evidence presented at that hearing. However, Clinton was not denied participation at the Confirmation Hearing. Clinton had every opportunity, at the Confirmation Hearing, to reexamine the witnesses who testified at the Trustee Hearing.
 
 [10]
 
 Because Clinton had the opportunity at the Confirmation Hearing to challenge the pri- or testimony and chose not to do so, we conclude that the bankruptcy court’s ruling on Clinton’s participation at the Trustee Hearing did not cause prejudice.
 
 [11]
 
 Hence, Judge Young could properly consider the prior testimony in ruling on confirmation.
 

 Finally, we hold that the Debtor provided Clinton with adequate notice that his alleged misconduct would be considered at the Confirmation Hearing. The Supreme Court has stated that to comport
 
 *1360
 
 with the requirements of due process, notice must “apprise the affected individual of, and permit adequate preparation for, an impending ‘hearing.’ ”
 
 Memphis Light, Gas & Water Division v. Craft,
 
 436 U.S. 1, 14, 98 S.Ct. 1554, 1563, 56 L.Ed.2d 30, 42 (1978) (footnote omitted).
 
 See also Mullane v. Central Hanover Bank & Trust Co.,
 
 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed.2d 865 (1950). The Disclosure Statement outlined the allegations of misconduct, and the bankruptcy court found this document would enable creditors to make an informed judgment about the Plan. Clinton does not deny he received this document. Hence, Clinton knew the allegations of misconduct were relevant and would be considered in confirming the Plan.
 
 [12]
 
 Although the Debtor did not specifically inform Clinton that counsel would refer to the evidence presented at the Trustee Hearing, we do not believe this affected Clinton’s ability to prepare for the Confirmation Hearing. Clinton gave no indication that he desired to examine the witnesses who testified at the Trustee Hearing. For example, when the Debtor referred to the prior testimony, Clinton did not request a continuance to enable him to call the prior witnesses to testify or to present other, evidence.
 
 See In Re Clifton Steel Corp.,
 
 35 B.R. 732, 736 (N.D.N.Y.1983) (no violation of due process where party failed to ask for adjournment).
 
 See also Gorham v. Wainwright,
 
 588 F.2d 178, 180 (5th Cir.1979) (criminal context). The Debtor satisfied the requirements of due process.
 
 See generally In re Gregory,
 
 705 F.2d 1118, 1122-23 (9th Cir.1983).
 

 B.
 
 Statutory Requirements
 

 11 U.S.C. § 1129(a)(1) (1982) provides that a court may only confirm a plan where “[t]he plan complies with the applicable provisions of this title.”
 
 See In re Toy & Sports Warehouse, Inc.,
 
 37 B.R. 141, 149 (Bankr.S.D.N.Y.1984). Clinton argues that the Management Provisions in the Debtor’s Plan violate several provisions of the Code. We disagree.
 
 [13]
 

 1.
 
 Plan Not Contrary to Law
 

 11 U.S.C. § 1129(a)(3) (1982) requires that a plan be “proposed in good faith and not by any means forbidden by law.” Clinton contends that the term “law” in this provision includes state law.
 
 See In re Koelbl,
 
 751 F.2d 137, 139 (2d Cir.1984).
 
 Compare
 
 3 W. Norton
 
 Norton Bankruptcy Law and Practice,
 
 § 63.08, at 10 (1985) [hereinafter cited as
 
 “Norton”].
 
 Clinton argues that the Management Provisions violate Idaho law giving shareholders the right to vote for directors, because during the period of the Plan he is denied the right to vote for the removal or election of directors. Idaho Code §§ 30-1-33, 30-1-36 (1980). The Debtor responds that the term “law” in § 1129(a)(3) does not refer to state law, and that even if it does, state law must yield to controlling provisions of the Code.
 
 See generally
 
 11 U.S.C. § 1123(a)(7) (1982);
 
 Perez v. Campbell,
 
 402 U.S. 637, 652, 91 S.Ct. 1704, 1709 29 L.Ed.2d 233 (1971).
 

 We need not reach these various issues of statutory interpretation, because Clinton has constructed his argument upon a faulty premise. The Plan does not deprive Clinton of any rights provided under Idaho law. Section 30-1-65 of the Idaho Code permits modification of shareholder rights under a plan of reorganization by amendment of the articles of incorporation. The amendment may become effective without shareholder approval.
 
 [14]
 
 Under
 
 *1361
 
 Idaho law, a shareholder does not have an unalterable right to vote in the context of a Plan of Reorganization approved under the Code. The Plan, therefore, does not violate a right given under Idaho law.
 
 [15]
 

 See generally In re Johns-Manville Corp.,
 
 52 B.R. 879, 889 (Bankr.S.D.N.Y.1985) (involving analogous state law).
 

 2.
 
 Nonvoting Securities and Appropriate Distribution of Voting Power
 

 Clinton contends the Management Provisions violate 11 U.S.C. § 1123(a)(6) (1982). This section provides that a plan must “provide for the inclusion in the charter of the debtor, if the debtor is a corporation ... of a provision prohibiting the issuance of nonvoting equity securities, and providing, as to the several classes of securities possessing voting power, an appropriate distribution of voting power_” The Debtor responds that the Plan does not provide for the issuance of nonvoting securities and that § 1123(a)(6) is therefore inapposite.
 

 The Debtor has correctly noted § 1123(a)(6) only prohibits the issuance of
 
 new
 
 nonvoting securities.
 
 See
 
 6A J. Moore,
 
 Collier on Bankruptcy
 
 ¶ 10.21, at 101 (14th Ed.1977) (discussing legislative history under former Bankruptcy Act).
 
 [16]
 

 See also
 
 Krotinger,
 
 Management and Allocation of Voting Power in Corporate Reorganizations,
 
 41 Colum.L.Rev. 646, 664-65 (1941). The Debtor’s Plan does not provide for the issuance of new securities. Rather, the Plan provides that the two shareholders will retain their interests, and will not be permitted to vote for or remove the directors or officers during the penden-cy of the Plan.
 

 But this does not end our inquiry. Section 1123(a)(6) requires an “appropriate distribution of voting power” as to “the several classes of securities possessing voting power....” Section 1123(a)(7) (1982) provides that a plan must contain provisions “that are consistent with the interests of ... equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee. ...”
 
 See also
 
 11 U.S.C. § 1129(a)(5)(A) (ii)(1982). Sections 1123(a)(6) and 1123(a)(7) must be read together. These provisions require that the court scrutinize
 
 any
 
 plan which alters voting rights or establishes management in connection with a plan of reorganization, whether or not the plan provides for the issuance of new securities.
 
 *1362
 
 Krotinger,
 
 supra
 
 at 665 (suggesting this interpretation under Bankruptcy Act).
 
 See generally In re Quaker City Cold Storage Co.,
 
 71 F.Supp. 124, 129 (E.D.Pa.1947);
 
 In Re Parker Petroleum,
 
 39 SEC Rptr. 548, 571 (1959) (Securities and Exchange Commission interpretations); 5 L. King,
 
 Collier on Bankruptcy,
 
 ¶ 1123.01, at 1123-15 to 1123-16 (15th ed. 1985) [hereinafter cited as
 
 “Collier 15th
 
 ”]. In analyzing these provisions in plans, we believe a court should consider,
 
 inter alia,
 
 the shareholders’ interest in participating in the corporation, the desire to preserve the debtor’s reorganization, and the overall fairness of the provisions.
 
 See e.g.,
 
 S.Rep. No. 1917, 75th Cong., 3d Sess. 7, 35 (1938); 5
 
 Collier 15th, supra
 
 ¶ 1123.01, at 1123-16.
 
 See generally Quaker City Cold Storage Co.,
 
 71 F.Supp. at 131-32.
 

 The Management Provisions are consistent with the interests of equity security holders and with public policy. We note initially that the Code imposes upon the Debtor an affirmative duty to disclose any transaction that might raise even an arguable claim by or against the Debtor.
 
 See In re Venson,
 
 234 F.Supp. 271, 272 (N.D.Ga.)
 
 aff'd,
 
 337 F.2d 616 (5th Cir.1964);
 
 In re Gilbert,
 
 38 B.R. 948, 950 (Bankr.N.D.Ohio 1984). At the very least, the evidence presented at the Trustee Hearing revealed Clinton had caused the Debtor to violate this duty. Indeed, as a result of the Trustee Hearing, Clinton transferred a voting proxy to Haley which gave her exclusive control of the Debtor for two and one-half years.
 

 This alone, however, did not justify the extended denial of voting rights to Clinton during the pendency of the Plan. We recognize that a shareholder’s participation in a corporation “cannot be lightly cast aside_”
 
 In re Lifeguard Industries, Inc.,
 
 37 B.R. 3, 17 (Bankr.S.D.Ohio 1983). Clinton, however, presented Judge Young with no reasonable alternative but to extend Haley’s exclusive control beyond the two and one-half year period that the proxy was in effect. As Judge Young found, to allow Clinton to reexercise his voting rights upon the expiration of the proxy would have proven detrimental to all parties, including Clinton. The years of bitter acrimony between Clinton and Haley had so soured their relationship that any joint management would have resulted in corporate deadlock. Given the evidence of Clinton’s misconduct, Judge Young also correctly determined that vesting exclusive control in Clinton would have threatened the Debtor’s reorganization.
 
 See generally id.; In re Potter Instrument Co.,
 
 593 F.2d 470, 474-75 (2d Cir.1979). Further, Clinton did not propose an alternative plan of management (i.e., a trustee) or reorganization. Thus, Judge Young was forced either to allow Haley to continue to control the Debtor or reject the Plan and assure the Debtor’s dissolution. In view of these special circumstances, we hold that Judge Young properly approved the Management Provisions so as to preserve the prospects of reorganization and protect the interests of creditors, shareholders and interested parties.
 
 See generally Quaker City Cold Storage Co.,
 
 71 F.Supp. 124 (voting trust);
 
 In re Childs Co.,
 
 69 F.Supp. 856, 859-60 (S.D.N.Y.1946) (election of directors);
 
 In re Lower Broadway Prop.,
 
 58 F.Supp. 615 (S.D.N.Y.1945) (voting trust);
 
 In re Johns-Manville Corp.,
 
 52 B.R. 887-88 (Bankr.S.D.N.Y.1985) (shareholder meeting).
 
 [17]
 

 3.
 
 Equality of Treatment
 

 The Plan classifies both shareholders Clinton and Haley in the same class, but denies Clinton (and not Haley) the right to participate in management of the Debtor as an officer or director (unless he should be selected by the board of directors). Clinton contends this restriction on his shares conflicts with the requirement that the plan “provide the same treatment for each claim
 
 *1363
 
 or interest of a particular class....” 11 U.S.C. § 1123(a)(4) (1982).
 
 See generally In re B & W Enterprises, Inc.,
 
 19 B.R. 421, 425 (Bankr.Idaho 1982).
 

 Section 1123(a)(4) does not preclude classification of Clinton and Haley’s interest in the same class. This provision only requires equality of treatment of “claims” or “interests” placed in the same class. 5
 
 Collier 15th, supra
 
 ¶ 1123.01, 1123-8-1123-9. The term “interest” refers to the equity security interest of a shareholder.
 
 In re Young,
 
 48 B.R. 678, 683 n. 3 (Bankr.E.D.Mich.1985).
 
 See
 
 11 U.S.C. § 101(15)(A), (16) (1982) (equity security is a share in a corporation). Here, the Management Provisions treat the equity security interests the same.
 
 Both
 
 Haley
 
 and
 
 Clinton are prohibited from exercising their shareholder voting rights to elect or remove directors; neither may act in his or her capacity as a shareholder to alter the composition of the board of directors. Although the Plan provides that Haley alone may serve as director or officer without any action by the board of directors, her position as director and officer of the Debt- or is separate from her position as an equity security holder. Haley’s shares are placed in the same class and subject to the same voting restrictions as Clinton’s. Hence, the Plan does not violate § 1123(a)(4).
 

 4.
 
 Impairment and “Cram Down”
 

 Clinton also argues that the Plan impairs his interest as a shareholder under 11 U.S.C. § 1124(1) (1982). If the Plan impairs Clinton’s interest, then the Plan must comply with the requirements of “cram down.” 11 U.S.C. § 1129(b)(1) (1982).
 

 a.
 
 Impairment
 

 11 U.S.C. § 1124(1) provides that an interest is impaired
 
 unless
 
 the plan “leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest.” The focus of the impairment provision is different from that of § 1123(a)(4), considered previously. The equality of treatment provision of § 1123(a)(4) requires a comparison of all the interests similarly classified to determine whether there is any inequality in treatment among those interests. The impairment provision of § 1124(1) requires an examination of each interest to determine whether the plan alters the legal, equitable, or contractual rights of the holder of that interest.
 

 Focusing separately on Clinton’s interest as a holder of an equity security, we find that the Plan impairs his interest. The Plan modifies the Debtor’s articles and by-laws which permit shareholders to vote for directors.
 
 See generally DuVall v. Moore,
 
 276 F.Supp. 674, 680 (N.D.Iowa 1967) (relationship between shareholder and corporation is contractual). As noted, both Clinton and Haley are deprived of their ability to act in their capacities as shareholders to alter the management of the Debtor. Thus, notwithstanding the equality of treatment of the equity security interests, the Plan significantly alters each shareholder’s power to exercise his or her shareholder vote. Clinton’s shares, therefore, are impaired by this modification of his shareholder rights, and the Plan must meet the requirements of “cram down.”
 
 See generally In re Madison Hotel Assocs.,
 
 749 F.2d at 418-19; 5
 
 Collier 15th, supra
 
 ¶ 1124.03, at 1124-13 (“... [A]ny alteration of the rights constitutes impairment even if the value of the rights is enhanced.”).
 

 b.
 
 “Cram Down”
 

 11 U.S.C. § 1129(b) provides that if a plan meets all of the requirements for confirmation
 
 other
 
 than impairment, the court may confirm the plan “if the plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.” 11 U.S.C. § 1129(b)(1) (1982). Once again, Clinton contends that the Management Provisions violate these provisions. We find that this contention is without merit.
 

 
 *1364
 
 The terms “does not discriminate unfairly” and “fair and equitable” connote definite meanings within reorganization cases. Specifically, the concept of unfair discrimination applies to plans in which claims or interests have been subordinated.
 
 See
 
 Sponsors’ Remarks, 124 Cong.Rec. H11, 104 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards); 124 Cong.Rec. S17,420 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini).
 
 [18]
 
 The Collier treatise states that this provision requires that a plan “allocate[] value to the class in a manner consistent with the treatment afforded to other classes with similar legal claims against the debtor.” 5
 
 Collier 15th, supra
 
 ¶ 1129.03, at 1129-50.
 
 See also
 
 3
 
 Norton, supra
 
 § 63.21, at 25. Similarly, the Code provides specific examples of when a plan is “fair and equitable” in the treatment of equity security holders. 11 U.S.C. § 1129(b)(2)(B) (1982).
 
 See In re Toy & Sports Warehouse, Inc.,
 
 37 B.R. at 147-48; Klee,
 
 All You Ever Wanted to Know About Cram Down Under The New Bankruptcy Code,
 
 53 Am.Bankr.L.J. 133, 148-56 (1979).
 

 Here, Clinton does not argue that the Plan improperly treats subordinated claims or interests, or fails to satisfy the specific Code provisions on fair and equitable distributions. Rather, Clinton contends that the Management Provisions “unfairly discriminate” against his interest. We have already ruled that subsections (a)(6) and (a)(7) of § 1123 require scrutiny of provisions in plans which alter voting and management of the Debtor. We have conducted that scrutiny, and have determined that the Management Provisions of the Plan under the facts of this case are appropriate and consistent with the interests of the equity security holders and public policy. We have also noted our disinclination to find redundancy in the Code. We do not believe that § 1129(b)(1) also addresses provisions for management and voting of the Debtor.
 
 [19]
 
 Moreover, even if we were to construe the terms of “unfair discrimination” and “fair and equitable” broadly to require additional scrutiny of the Management Provisions, we would have no difficulty finding that the Plan does not unfairly discriminate against Clinton’s equity security interest and that the Plan is fair and equitable, for the reasons previously discussed in this opinion.
 

 5.
 
 Plan Feasibility
 

 Finally, we find that the Plan satisfies the “feasibility” requirement of 11 U.S.C. § 1129(a)(11) (1982). The Debtor presented ample evidence to demonstrate that the Plan has a reasonable probability of success.
 
 See generally In re Merrimack Valley Oil Co.,
 
 32 B.R. 485, 488 (Bankr.Mass.1983). The Debtor provided both “conservative” and “best case” projections. The Debtor’s experts testified that the Debtor’s assets are attractive and in demand. That the Plan provides for the eventual liquidation of assets does not preclude confirmation. 11 U.S.C. § 1123(a)(5)(D) (1982);
 
 In re Coastal Equities, Inc.,
 
 33 B.R. 898, 904 (Bankr.S.D.Cal.1983). We do not agree with Clinton’s
 
 *1365
 
 assertion that the Plan is a “visionary scheme,”
 
 In re Pizza of Hawaii,
 
 761 F.2d at 1382 (9th Cir.1985)
 
 (quoting
 
 5
 
 Collier 15th, supra
 
 ¶ 1129.02, at 1129-34), and we find no abuse of discretion in the bankruptcy court's determination that the Plan is feasible.
 

 AFFIRMED.
 

 [1]
 

 . Counsel for the Debtor argued that Clinton’s attorney should be permitted to "protect Mr. Clinton’s distinct interests and at the same time meet the challenges to his [Clinton’s] integrity that is the focus of the allegations.”
 

 Judge Young disagreed, stating " — I expect you to represent the corporation which is the entity, which is the debtor to which a trustee will be appointed or not. And the officers of that corporation as officers of the corporation.”
 

 [2]
 

 . Question: Would you characterize the bankruptcy schedules as misleading? Actually, a lit-tie stronger language, highly misleading, grossly misleading.
 

 Answer: Highly misleading, grossly misleading.
 

 Question: Could it be called fraudulent, couldn't it?
 

 Answer: I would have to agree with that.
 

 Mr. Collier [Clinton’s counsel]: Your Honor, I am going to object to that because please note there is an objection in the deposition to the form of the question that has been asked.
 

 [3]
 

 . Judge Young expressed concern about the Management Provisions:
 

 I am not totally without doubt; it does bother me that Mr. Clinton is refused voting rights during the term of the Plan. Nevertheless, my experience in this case over a period of time leads me to the conclusion that it is in the best interests of all parties including Mr. Clinton, that Management continue in full control of one of the set of stockholders and I think the evidence has established that Mrs. Haley at this point is the one who has proposed the plan_ I am absolutely convinced that if he is allowed to come in and vote stock, there will be a deadlock, chaos, continued problems with the execution of the plan.
 

 [4]
 

 . To determine whether a plan provides for equality of treatment, the court must compare the treatment of two or more claims or interests.
 
 See
 
 11 U.S.C. § 1123(a)(4) (1982). We believe that this is a factual determination. See
 
 infra
 
 text following note 17.
 

 [5]
 

 . Two of the issues in this appeal require some statutory interpretation. We must determine whether subsections (a)(6) and (a)(7) of 11 U.S.C. § 1123 require scrutiny of plans that modify the voting rights of existing shareholders. Similarly, we must also construe the terms “fair and equitable" and “unfair discrimination” in 11 U.S.C. § 1129(b)(1) (1982). We review these questions of statutory interpretation
 
 de novo. See generally In re Pacific Far East Line,
 
 713 F.2d at 478. Clinton also argues that the Debtor failed to meet the due process requirements of notice. This is a question of law reviewed
 
 de novo. In re Center Wholesale, Inc.,
 
 759 F.2d 1440, 1445 (9th Cir.1985).
 

 [6]
 

 . We recognize that the court in
 
 In re Missionary Baptist Found.,
 
 712 F.2d 206, 211 (5th Cir.1983) analyzed the issue presented there in the context of "judicial notice.” We do not comment upon the propriety of that analysis under the facts presented to that court. We only find that "judicial notice” is not at issue in this case. We also note that the court in
 
 Baptist
 
 ruled that the bankruptcy court had not acted improperly in considering the prior testimony.
 
 Id.
 

 [7]
 

 . However, the legislative history reveals that the hearing on the disclosure statement, and not the conformation hearing, is "the major hearing in a reorganization case_” Corotto & Picard,
 
 Business Reorganizations
 
 —A
 
 New Approach to Investor Protections and the Role of the SEC,
 
 28 De Paul L.Rev. 961, 989 (1979) (quoting H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 1, 227,
 
 reprinted in
 
 1978
 
 U.S.Code Cong. & Ad.News
 
 5787, 5963, 6186). Clinton received notice of and was present at the hearing on the disclosure statement.
 

 [8]
 

 . This section provides that: "A party in interest, including ... an equity security holder ... may raise and appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b) (1982).
 

 [9]
 

 . We need not resolve whether Clinton properly preserved his alleged right to appear as a party in interest.
 
 See infra
 
 note 11.
 

 [10]
 

 . Clinton suggested at oral argument that Judge Young prevented him from presenting evidence at the Confirmation Hearing. The record does not substantiate this contention. Clinton never attempted to present evidence, and Judge Young simply stated he had heard enough oral argument to render a ruling on confirmation. Clinton does not allege that the prior witnesses were unavailable.
 

 [11]
 

 .Because we find that the Confirmation Hearing cured any prior error, we need not decide (a) whether Clinton properly preserved the issue of his alleged right to appear at the Trustee Hearing under § 1109(b); and (b) whether the denial of counsel violated due process.
 
 See generally In re Davis,
 
 23 B.R. 773, 776 (Bankr. 9th Cir.1982).
 

 [12]
 

 .We do not suggest that a proponent of a plan will
 
 always
 
 satisfy the notice requirements by placing information in the Disclosure Statement. We only find that, given the centrality of the allegations of misconduct and the language in the Disclosure Statement, Clinton was on notice that the court would consider this in ruling on confirmation.
 
 See generally In re Petro,
 
 18 B.R. 566, 569-70 (Bankr.E.D.Pa.1982).
 

 [13]
 

 . We do find that Clinton’s interest was impaired, but that the Plan satisfied the requirements of "cram down.”
 
 See infra
 
 text accompanying notes 18-19.
 

 [14]
 

 . Section 30-1-65 of the Idaho Code provides:
 

 (a) Whenever a plan of reorganization of a corporation has been confirmed by decree or order of a court of competent jurisdiction in proceedings for the reorganization of such cor
 
 *1361
 
 poration, pursuant to the provisions of any applicable statute of the United States relating to reorganizations of corporations, the articles of incorporation may be amended in the manner provided in this section, in as many respects as may be necessary to carry out the plan and put it into effect, so long as the articles of incorporation as amended contain only such provisions as might be lawfully contained in original articles of incorporation at the time of making such amendment.
 

 (b) "... [T]he articles ... may be amended ... so as to;
 

 [[Image here]]
 

 (2) Repeal, alter or amend the bylaws of the corporation.
 

 [[Image here]]
 

 (4) Change the preferences, limitations and relative rights in respect of all or any part of the shares....
 

 [[Image here]]
 

 (6) Constitute or reconstitute the board of directors of the corporation, and appoint directors and officers in place of or in addition to all or any of the directors or officers then in office.
 

 [[Image here]]
 

 (d) The amendment shall become effective ... without any action thereon by the directors or shareholders of the corporation and with the same effect as if the amendments had been adopted by unanimous action of the directors and shareholders of the corporation.
 

 Although the bankruptcy court did not rest its decision on this provision, we may affirm on any basis presented in the record.
 
 Trerice v. Pedersen,
 
 769 F.2d 1398, 1400 (9th Cir.1985). We determine
 
 infra
 
 text accompanying notes 17-18 that the Code permits provisions such as the Management Provisions.
 

 [15]
 

 . Hence, we need not reach Clinton’s contention that the Management Provisions constitute an impermissible taking of rights accorded under state law.
 
 See generally Bank of Arizona
 
 v.
 
 Trustee for Westgate-Califomia Corp.,
 
 609 F.2d 1274, 1278 (9th Cir.1979)
 
 cert. denied,
 
 444 U.S. 1015, 100 S.Ct. 667, 62 L.Ed.2d 645 (1980).
 

 [16]
 

 . 11 U.S.C. §§ 1123(a)(6) and (a)(7) (discussed
 
 infra)
 
 are derived from 11 U.S.C. § 616 (amended 1978) of the former Bankruptcy Act and copied almost verbatim. S.Rep. No. 95-989, 95th Cong., 2d Sess. 119,
 
 reprinted in
 
 1978
 
 U.S. Code Cong. & Ad.News
 
 5787, 5905.
 

 [17]
 

 . Judge Young retained jurisdiction over the Plan to ensure that Haley properly manages the Debtor. Clinton is free to go to the bankruptcy court to complain about any breach of the Plan or of Haley’s failure to discharge her duties to the Debtor and Clinton. Clinton is also free to vote his shares except with regard to changing management.
 

 [18]
 

 . Senator DeConcini stated on the floor of the Senate:
 

 The requirement of the House bill that a plan not ‘discriminate unfairly’ with respect to a class is included for clarity; the language in the House report interpreting that requirement in the context of subordinated debentures, applies equally under the requirements of section 1129(b)(1) of the House amendment.
 

 The House report describes in detail the meaning of "unfair discrimination." H.R.Rep. No. 595, 95th Cong., 1st Sess. 417-18
 
 reprinted in
 
 1978
 
 U.S.Code Cong. & Ad.News,
 
 5963, 6372-74. We need not provide a detailed explanation of this term. We only discuss the legislative history to make the point that this term applies to a specific type of claim or interest, and a specific type of plan.
 

 [19]
 

 . We do not find any anomaly in our determination that Clinton's interest is impaired, but that the "cram down" provisions permit implementation of the Management Provisions which constitute the cause of that impairment. The "cram down” provisions "contain[ ] minimum standards which a plan of reorganization must meet to be considered for confirmation." 5
 
 Collier 15th, supra
 
 ¶ 1129.03, at 1129-51. The Plan complies with these “minimum standards," notwithstanding that the Plan impairs Clinton’s interest.