# United States Court of Appeals

## For the Eighth Circuit

_____

No. 18-1302

_____

In re: Peabody Energy Corporation

*Debtor*

------------------------------

Ad Hoc Committee of Non-Consenting Creditors

*Appellant*

v.

Peabody Energy Corporation; Citibank, N.A.; Aurelis Capital Management, LP; Elliott Management Corporation; South Dakota Investment Council; Panning Capital Management, LP; PointState Capital, LP; Contrarian Capital Management, LLC; Discovery Capital Management; South Dakota Retirement System; Wilmington Savings Fund Society, FSB; Official Committee of Unsecured Creditors of Peabody Energy Corporation

*Appellee*s

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: April 16, 2019
Filed: August 9, 2019

_____

Before SHEPHERD, MELLOY, and GRASZ, Circuit Judges.

_____

MELLOY, Circuit Judge.

In April 2016, Peabody Energy Corporation and its affiliates (the "Debtors") filed a voluntary reorganization petition under Chapter 11 of the Bankruptcy Code. In March 2017, over the objection of the Ad Hoc Committee of Non-Consenting Creditors (the "Ad Hoc Committee"), the bankruptcy court confirmed a reorganization plan proposed by the Debtors. The Ad Hoc Committee appealed to the district court,[1] which dismissed the appeal as equitably moot. Alternatively, the district court approved the plan on the merits, holding that the plan: (1) comported with the requirement in 11 U.S.C. § 1123(a)(4) that all claims in a particular class be treated the same; and (2) was proposed in good faith. We, too, affirm on the merits.

## I. Background

The Debtors are an American coal company and some of its subsidiaries. Over the middle years of this decade, a variety of factors decreased the demand for and price of American-produced coal. The decreased demand and lower prices resulted in a sharp decline in the Debtors' revenues. Impacted by these falling revenues and weighed down by what the Debtors call "substantial debt obligations," the Debtors filed for reorganization under Chapter 11.

Before filing their reorganization petition, however, a dispute arose between several of the Debtors' secured and senior-unsecured creditors (the "security-interest dispute"). The creditors disagreed over the extent to which the Debtors' assets served as collateral for the secured creditors' debts. The Debtors filed their petition and then, to resolve the security-interest dispute, commenced an adversary proceeding seeking a declaratory judgment on the matter.

---

[1]The Honorable Audrey G. Fleissig, United States District Judge for the Eastern District of Missouri.

Non-binding mediation followed. Negotiations in the mediation gradually expanded from resolving the security-interest dispute to formulating a reorganization plan. The negotiating parties included the Debtors and a group of seven holders of the Debtors' second-lien and senior-unsecured notes. On appeal, the parties refer to this group as the "Noteholder Co-Proponents." Members of the Ad Hoc Committee did not participate in the mediation, though they did receive notice. Eventually, the negotiating parties crafted a complex plan for reorganization as part of a global settlement. The plan was expressly conditioned on approval by the bankruptcy court.

In general, the plan that emerged from the mediation provided a way for the Debtors to raise $1.5 billion in new money to pay for distributions under the plan and fund operations following reorganization. This was to be accomplished by two sales. The first was a sale of common stock at a discount to certain classes of creditors. The second was an exclusive sale of discounted preferred stock to qualifying creditors. As will be discussed in greater detail below, creditors could qualify to buy the preferred stock by executing certain agreements that obligated them to: (1) buy a set amount of preferred stock; (2) agree to backstop (i.e., purchase shares of common and preferred stock that did not sell) both sales; and (3) support the plan in the confirmation process. The amount of preferred stock qualifying creditors could and were required to buy depended on the portion of the prebankruptcy debt they owned and also on when they became qualifying creditors (i.e., how quickly they took action to qualify). Qualifying creditors also received several premiums for executing the agreements.

More specifically, the plan included the following elements. First, the plan required the reorganized Debtors to engage in a $750 million "Rights Offering" following reorganization. The Rights Offering allowed holders of certain unsecured notes known as Class-5B claims and second-lien note holders to purchase common stock in the reorganized company at a 45% discount to the value the negotiating parties agreed the common stock should be worth (what the Ad Hoc Committee refers to as "Plan Equity Value"). The parties agree that this element of the plan is not contested.

Second, the plan required the reorganized Debtors to engage in a $750 million "Private Placement" whereby qualifying creditors could purchase preferred stock in the reorganized Debtors at a 35% discount to the Plan Equity Value. A creditor qualified to participate in the Private Placement if it: (1) held a second-lien note or Class-5B claim; (2) signed a "Private Placement Agreement" that committed the creditor to purchase a certain amount of preferred stock based on when it signed the agreement; (3) agreed to backstop the Rights Offering; and (4) agreed to support the reorganization plan throughout the confirmation process.

The negotiating parties developed an intricate three-phase system for determining who could and must buy what in the Private Placement. In Phase One, the Noteholder Co-Proponents were given the exclusive right and obligation to purchase the first 22.5% of preferred stock at the discounted price. The Noteholder Co-Proponents also had to purchase what remained of the 77.5% of preferred stock that did not sell in the next two phases. In Phase Two, the Noteholder Co-Proponents plus any creditor who took action to qualify by an initial deadline (the "Phase-Two investors") received the exclusive right and obligation to purchase the next 5% of the preferred stock at the discounted price. The Phase-Two investors were also obligated to purchase whatever remained unsold of the 72.5% of preferred stock in the next phase. Finally, in Phase Three, the Noteholder Co-Proponents, the Phase-Two investors, plus any creditor who took action to qualify after Phase Two but before the close of the sale received the exclusive right and obligation to purchase the remaining 72.5% of preferred stock at the discounted price.

The Debtors agreed to pay creditors who participated in the Private Placement certain premiums "in consideration for" their agreements. For agreeing to backstop the Rights Offering, the creditors were promised a "Backstop Commitment Premium" worth $60 million (i.e., 8% of the $750 million raised). They were also promised a "Ticking Premium" worth $18,750,000, which was to be paid monthly through a designated closing date. Corresponding commitment and ticking premiums were paid

to creditors who agreed to buy their portion of the preferred stock in the Private Placement. All the premiums were paid in common stock of the reorganized Debtors.

In essence, holders of second-lien and Class-5B claims could buy a significant amount of stock in the reorganized Debtors at a discount and receive significant premiums in exchange for promptly agreeing to backstop the arrangement and support the plan. Moreover, under the plan, holders of second-lien and Class-5B claims were also entitled to recover significant portions of their claims regardless of whether they participated in the Private Placement. Holders of second-lien claims, for instance, were expected to receive an estimated 52.4% of the face value of their claims, and holders of Class-5B claims were expected to receive approximately 22.1%.

On December 22, 2016, the Debtors moved to approve a disclosure statement and set a confirmation hearing date. The next day, the Debtors moved for an order approving the Private Placement and backstop agreements and authorizing the Debtors to enter into those agreements. This started the clock ticking on when creditors had to qualify to participate in the various phases of the Private Placement—creditors had three days to qualify to participate in Phase Two, and thirty-three days to qualify to participate in Phase Three. The agreement-approval motion also asked for authorization to enter into a plan-support agreement and for approval of the Rights Offering.

Members of the Ad Hoc Committee elected not to sign the various agreements. Thus, they never qualified to participate in the Private Placement. Instead, shortly after the Debtors filed the motions just described, the Ad Hoc Committee submitted the first of several alternative-plan proposals to the Debtors and the Official Committee of Unsecured Creditors (the "Official Committee"). The proposals included an offer to backstop a $1.77 billion rights offering that would take the place of the Rights Offering and Private Placement proposed by the Debtors' plan. According to testimony and sworn statements from the Debtors' CFO, each time the

-5-

Debtors received an alternative-plan proposal, they reviewed the proposal with advisors and considered it at board meetings, analyzing each proposal against the Debtors' main goals for reorganization.[2] With each proposal, the Debtors determined that the proposed alternative either: (1) would not accomplish their goals as well as the Debtors' proposed plan would; or (2) would add significant legal expenses and delay to the already expensive and lengthy reorganization process. The Official Committee independently reviewed the Ad Hoc Committee's proposals and found them to be inferior to the Debtors' proposed plan.

On January 26, 2017, the bankruptcy court held a hearing on the Debtors' motions. The bankruptcy court approved the disclosure statement and scheduled a confirmation hearing. The bankruptcy court also, over the Ad Hoc Committee's objections, granted the Debtors' agreement-approval motion. By the date of the confirmation hearing, all twenty classes of the Debtors' creditors had voted overwhelmingly to approve the plan and approximately 95% of the Debtors' unsecured creditors had agreed to participate in the Private Placement and make backstop commitments. The bankruptcy court held the confirmation hearing and confirmed the Debtors' proposed plan. The Ad Hoc Committee promptly appealed to the district court.

Following confirmation and the Debtors' formal emergence from bankruptcy as a reorganized company, the reorganized Debtors began consummating the plan. By April 4, 2017, the reorganized Debtors had received $1.5 billion from investors pursuant to the Rights Offering and Private Placement and had issued and distributed millions of shares of preferred and common stock in the newly reorganized company

---

[2]The Debtors have consistently declared throughout the bankruptcy proceedings that their goals for reorganization were to: (1) emerge from bankruptcy with adequate liquidity to weather the volatile business cycles inherent in the coal industry; (2) ensure that following emergence they could pay their debts on time; (3) maximize the size of their estate for the creditors' benefits; and (4) achieve the broadest consensus among creditors possible.

to compensate those investors. The reorganized Debtors had also received exit financing, paid over $3.5 billion in claim distributions under the plan, and completed many more plan-related transactions before the district court reviewed the case.

Against that backdrop, the district court granted a motion to dismiss filed by the Debtors. The district court held that the appeal was "equitably moot" because the plan had been substantially consummated. Alternatively, the district court affirmed the judgment of the bankruptcy court, finding that the equal-treatment requirement of 11 U.S.C. § 1123(a)(4) had been satisfied and that the Debtors had proposed the plan in good faith. The Ad Hoc Committee timely appealed.

## II. Discussion

At issue before us is whether the bankruptcy court erred in determining that the Debtors' plan satisfied the equal-treatment rule and was proposed in good faith. Because we find no error, we need not address the Debtors' argument that the Ad Hoc Committee's appeal is equitably moot.

"As the second reviewing court in a bankruptcy case, we apply the same standard of review as the district court." Melikian Enters., LLLP v. McCormick, 863 F.3d 802, 806 (8th Cir. 2017) (citation omitted). We review the bankruptcy court's legal conclusions de novo and its factual findings for clear error. Id. "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Hill v. Snyder, 919 F.3d 1081, 1084 (8th Cir. 2019) (internal quotation marks and citation omitted).

Whether a reorganization plan was proposed in good faith is a factual question. See Hanson v. First Bank of S.D., N.A., 828 F.2d 1310, 1315 (8th Cir. 1987) (reviewing a bankruptcy court's finding that a plan had been proposed in good faith for clear error), partially abrogated on other grounds by Pioneer Inv. Servs. Co v.

-7-

Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 387 n.3, 394 (1993); see also In re Andreuccetti, 975 F.2d 413, 420 (7th Cir. 1992) (stating that a finding whether a reorganization plan was proposed in good faith "is one of fact, which we will not overturn unless it is clearly erroneous"). We have not addressed whether a determination that the equal-treatment rule has been satisfied is a factual finding subject to clear-error review or a legal conclusion subject to de novo review. At least one circuit has concluded that it is a factual finding and should not be disturbed unless clearly erroneous. See Acequia, Inc. v. Clinton (In re Acequia, Inc.), 787 F.2d 1352, 1358 & n.4 (9th Cir. 1986). We need not decide the issue here. Even assuming the standard of review is de novo, our conclusion as to the alleged equal-treatment violation in this case would be the same.

A. Equal Treatment

The Ad Hoc Committee argues that the right of qualifying creditors to participate in the Private Placement was unequal treatment for their claims, a violation of 11 U.S.C. § 1123(a)(4). Section 1123(a)(4) states that a reorganization plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." Neither the Supreme Court nor our Court has interpreted that provision, and the Code does not define the standard of equal treatment. See In re AOV Indus., Inc., 792 F.2d 1140, 1152 (D.C. Cir. 1986) (noting that "neither the Code nor the legislative history precisely defines the standards of equal treatment").

Cases from other circuits that have dealt with the issue, however, appear to agree that a reorganization plan may treat one set of claim holders more favorably than another so long as the treatment is not for the claim but for distinct, legitimate rights or contributions from the favored group separate from the claim. The Second Circuit, for instance, held that § 1123(a)(4) was not violated where a plan treated an equity holder better than other equity holders in the class because the equity holder:

(1) had a secured claim separate from its equity interest; and (2) had "agreed to attribute" to the reorganized debtor certain "causes of action against third parties." Ahuja v. LightSquared Inc., 644 F. App'x 24, 29 (2d Cir. 2016). The Fifth Circuit concluded that a plan proponent's payments to certain members of a debtor power cooperative did not violate § 1123(a)(4) because the payments were "reimbursement for plan and litigation expenses," not payments "made in satisfaction of the [members'] claims against [the debtor]." Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.), 150 F.3d 503, 518–19 (5th Cir. 1998). And the Ninth Circuit upheld a plan that provided preferential treatment to one of a debtor's shareholders apparently because the preferential treatment was tied to the shareholder's service to the debtor as a director and officer of the debtor, not to the shareholder's ownership interest. See Acequia, 787 F.2d at 1362–63 ("[The shareholder's] position as director and officer of the Debtor is separate from her position as an equity security holder.").

Here, the opportunity to participate in the Private Placement was not "treatment for" the participating creditors' claims. 11 U.S.C. § 1123(a)(4). It was consideration for valuable new commitments made by the participating creditors. The participating creditors were investors who promised to support the plan, buy preferred stock that did not sell in the Private Placement, and backstop the Rights Offering. In exchange, they received the opportunity to buy preferred stock at a discount as well as premiums designed to compensate them for shouldering significant risks.

The Ad Hoc Committee argues that Bank of America National Trust & Savings Ass'n v. 203 North LaSalle Street Partnership, 526 U.S. 434 (1999), calls for a different conclusion. We disagree. In LaSalle, the Supreme Court rejected a reorganization plan that gave a debtor's prebankruptcy equity holders the exclusive opportunity to receive ownership interests in the reorganized debtor if the equity holders would invest new money in the reorganized debtor. Id. at 437. The plan in LaSalle had been "crammed down" under 11 U.S.C. § 1129(b) despite the objections of a senior class of the debtor's impaired creditors who claimed that the plan violated

the absolute priority rule. See id. at 441–43; see also 11 U.S.C. § 1129(b)(2)(B)(ii) (stating that in a cramdown situation "the holder of any claim or interest that is junior to the claims of [a class of unsecured claims may] not receive or retain under the [proposed] plan on account of such junior claim or interest any property"). The Court explained that the exclusive opportunity given to the equity holders was "a property interest extended 'on account of'" the equity holders' equity interests in the reorganizing debtor. LaSalle, 526 U.S. at 456. The Court found troubling the facts that the equity holders had paid nothing for the valuable exclusive opportunity and the debtor had not considered any alternative ways of raising capital. Id. Given these facts, the Court concluded that the "very purpose of the whole transaction" must have been, "at least in part, to do old equity a favor . . . because of old equity's prior interest" in the debtor. Id.

LaSalle is distinguishable from this case in at least three ways. First, the Ad Hoc Committee was not excluded from any opportunity like the creditors in LaSalle were. The Ad Hoc Committee could have participated in the Private Placement at any phase had they timely taken the necessary actions to qualify.[3] Second, unlike the equity holders in LaSalle, creditors who participated in the Private Placement gave something of value up front in exchange for their right to participate: They promised to support the plan, buy preferred stock that did not sell in the Private Placement, and backstop the Rights Offering.[4] Third, unlike the debtor in LaSalle, the Debtors here

---

[3]To the extent that the Ad Hoc Committee argues that it was unable to participate in the first phase of the Private Placement, we note, as did the bankruptcy court, that the Ad Hoc Committee could have intervened in the non-binding mediation that resulted in the formulation of the plan. See Fed. R. Bankr. P. 2018(a) ("In a case under the Code, after hearing on such notice as the court directs and for cause shown, the court may permit any interested entity to intervene generally or with respect to any specified matter.").

[4]The Ad Hoc Committee focuses on the fact that under the Private Placement and backstop agreements the participants were paid handsome premiums for their agreement to buy all unsold preferred stock and backstop the Rights Offering. The

-10-

considered several alternative ways to raise capital, including proposals submitted by the Ad Hoc Committee. The Debtors reviewed each alternative-plan proposal with advisors and analyzed the merits of each at board meetings.[5] With each proposal, the Debtors determined that the proposed alternative would either be less effective at accomplishing their goals than their plan, or it would cost too much in terms of time or money. Indeed, the Debtors' CFO testified at the confirmation hearing that delay was likely to cost the Debtors around $30 million per month, not including any litigation expenses related to resolving the security-interest dispute. Moreover, the Official Committee, acting in a fiduciary capacity, independently reviewed the Ad Hoc Committee's proposals and found them to be inferior to the Debtors' proposed plan. Because it is distinguishable, LaSalle does not convince us that § 1123(a)(4) has been violated here.

In sum, we agree with the bankruptcy court that the right to participate in the Private Placement was not "treatment for" a claim. 11 U.S.C. § 1123(a)(4). The right to participate in the Private Placement was consideration for valuable new commitments. Consequently, the plan did not violate the equal-treatment rule of § 1123(a)(4).

---

right to buy the preferred stock at a discount, the Ad Hoc Committee argues, could not also have been consideration for those commitments. We disagree. The Private Placement participants did receive premiums for committing to buy the unsold preferred stock and to backstop the Rights Offering. However, the right to buy the preferred stock at a discount may also be seen as an incentive to agree to support the plan or to stop pursuing the security-interest dispute. Moreover, the right to buy at a discount and the premiums could, together, be viewed as necessary consideration for the promises to buy the unsold preferred stock and to backstop the Rights Offering, especially given the volatility of coal markets at the time and uncertainty as to the Debtors' future.

[5]The Ad Hoc Committee does not challenge the Debtors' assertion that the Debtors consulted with advisors and considered the alternative-plan proposals at board meetings.

## B. Good Faith

The second issue before us is whether the bankruptcy court erred in determining that the Debtors proposed their plan in good faith. The Ad Hoc Committee argues a lack of good faith for three reasons: (1) "the Plan failed to maximize the value of the Debtors' estate" because the preferred stock was not sold for its full value; (2) "the Plan gave certain class members additional benefits in exchange for settling class-wide disputes"—namely, the Noteholder Co-Proponents were able to buy more preferred stock in the Private Placement than other members of their class; and (3) "the Plan Proponents employed a coercive process that induced holders to vote to accept the Plan." (Emphasis omitted).

A bankruptcy court "shall confirm a plan only if . . . [t]he plan has been proposed in good faith." 11 U.S.C. § 1129(a)(3). "[T]he term 'good faith' is left undefined by the Code." Hanson, 828 F.2d at 1315. However, "[i]n the context of a chapter 11 reorganization, . . . a plan is considered proposed in good faith 'if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.'" Id. (citation omitted). To determine whether a plan has been proposed in good faith, the "totality of the circumstances" surrounding the creation of the plan must be considered. In re Madison Hotel Assocs., 749 F.2d 410, 425 (7th Cir. 1984) (quoting Jasik v. Conrad (In re Jasik), 727 F.2d 1379, 1383 (5th Cir. 1984)). Because "[t]he bankruptcy judge is in the best position to assess the good faith of the parties' proposals," id. (alteration in original) (citation omitted), we review the question of good faith for clear error, see Hanson, 828 F.2d at 1312, 1315 (articulating the standard of review).

We hold that the bankruptcy court did not clearly err in finding that the Debtors proposed their plan in good faith. The record shows that the Debtors mediated with their creditors to resolve a major dispute between those creditors. The Debtors reached a settlement with substantial input from the negotiating parties. Other creditors who received notice, including members of the Ad Hoc Committee, could

-12-

have joined had they chosen to intervene in the mediation. The settlement revolved around a plan that allowed all first-lien holders to be paid off, all second-lien holders to receive approximately 52.4% of the face value of their claims, and all unsecured creditors to receive approximately 22.1% of their claims' face value. The plan garnered tremendous consensus—all twenty classes of creditors voted overwhelmingly to approve the plan and approximately 95% of the Debtors' unsecured creditors agreed to participate in the Private Placement and make backstop commitments. And the Debtors permitted alternative plans to be proposed, all of which the Debtors considered with advisors and at board meetings.

The Ad Hoc Committee disagrees, arguing that the plan failed to maximize value. We acknowledge that the Debtors might have made more money selling the preferred stock at full price. However, this argument ignores the point that the Debtors might not have convinced the parties to the security-interest dispute to settle or commit to any number of the other agreements if the Debtors had not offered the preferred stock at a discount. The Debtors' overall efforts to reorganize might have otherwise been thwarted had they followed the course proposed by the Ad Hoc Committee. We cannot look merely at the potential virtues of the Ad Hoc Committee's proposed alternative while ignoring the potential risks involved. See In re Madison Hotel Assocs., 749 F.2d at 425 (stating that when considering whether a plan has been proposed in good faith, the totality of the circumstances must be considered).

The Ad Hoc Committee also argues that the Noteholder Co-Proponents received a disproportionate opportunity to participate in the Private Placement. We see no merit to their concern. A sub-group of a creditor class certainly obtained favored treatment by participating in the mediation and in the offerings formulated in that mediation. However, that sub-group took on more obligations than other members of the class: They put themselves on the hook to buy more of the preferred stock if it did not sell, something that might easily have happened as the Debtors were emerging from mediation during volatile coal-market seasons.

Finally, the Ad Hoc Committee argues that the Debtors coercively solicited votes in favor of the plan. We are somewhat sympathetic to this argument. It is troubling that creditors wishing to take part in the Private Placement had to elect to do so before approval of all the agreements and the disclosure statement. We are convinced, however, by the Debtors' argument that time was of the essence given the volatile nature of the coal market. Moreover, as noted above, delay was likely to cost the Debtors around $30 million per month in addition to other litigation costs. We also find convincing an argument made by the Official Committee that, were it not for the existence of a support agreement, Private Placement parties might have had an incentive to sabotage the plan and obtain breakup fees should coal-market conditions worsen.

Thus, despite any reservation we might have regarding the good faith question, we have not been left with a "definite and firm conviction that a mistake has been committed." Hill, 919 F.3d at 1084 (citation omitted). We therefore do not disturb the bankruptcy court's factual finding that the Debtors proposed their plan in good faith.

## III.  Conclusion

We affirm the judgment of the district court on the merits.

_____

-14-